# Exhibit 1

C 1

# Commonwealth of Massachusetts

MIDDLESEX,SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 2081CV01665

Ultimate Classic
Construction Inc._____, PLAINTIFF(S),

v. Blackboard Specialty Insurance
Company f/k/a Hamilton
Specialty Insurance_____, DEFENDANT(S)
Company, et al



SUMMONS

THIS SUMMONS IS DIRECTED TO _Blackboard Specialty*_____ . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the _Middlesex Superior_ Court. YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. If you need more time to respond, you may request an extension of time in writing from the Court.

2. How to Respond. To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a. Filing your signed original response with the Clerk's Office for Civil Business,Superior_ Court, 200 Trade____(address), by mail or in person, **AND** Center, Woburn, MA 01801

   b. Delivering or mailing a copy of your response to the Plaintiff's Attorney/Plaintiff at the following address: _Alan M. Cohen, 550 Worcester Rd., Framingham MA 01702_

3. What to include in your response. An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as counterclaims) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must specifically request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a "Motion to Dismiss," if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Mass. R. Civ. P. 12. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rules of court.

* Insurance Company f/k/a Hamilton Specialty Insurance Company

4.   **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.   **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on ___July 22___ , 20 _20_.

_[signature]_

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on_____, 20___, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____, 20___        Signature:_____

N.B.    TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

```
┌──────────────────────────────────────┐
│                                      │
│                           , 20___    │
│                                      │
└──────────────────────────────────────┘
```

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 2081CV01665 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| **CASE NAME:** Ultimate Classic Construction INC. vs. Blackboard Specialty Insurance Company Formerly Known As Hamilton Specialty Insurance Company et | | Michael A. Sullivan, Clerk of Court Middlesex County |
| TO: al Alan Mark Cohen, Esq. Law Offices of Alan M Cohen LLC 550 Worcester Rd Framingham, MA 01702 | | **COURT NAME & ADDRESS** Middlesex County Superior Court - Woburn 200 Trade Center Woburn, MA 01801 |

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

STAGES OF LITIGATION                                           DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 10/14/2020 | |
| Response to the complaint filed (also see MRCP 12) | | 11/13/2020 | |
| All motions under MRCP 12, 19, and 20 | 11/13/2020 | 12/14/2020 | 01/12/2021 |
| All motions under MRCP 15 | 11/13/2020 | 12/14/2020 | 01/12/2021 |
| All discovery requests and depositions served and non-expert depositions completed | 05/12/2021 | | |
| All motions under MRCP 56 | 06/11/2021 | 07/12/2021 | |
| Final pre-trial conference held and/or firm trial date set | | | 11/08/2021 |
| Case shall be resolved and judgment shall issue by | | | 07/18/2022 |

The final pre-trial deadline is not the scheduled date of the conference. You will be notified of that date at a later time.

Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.

This case is assigned to

| DATE ISSUED 07/16/2020 | ASSISTANT CLERK Arthur T DeGuglielmo | PHONE (781)939-2757 |
|---|---|---|

Date/Time Printed: 07-15-2020 12:33:58                                                          SCV026\ 08/2018

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| PLAINTIFF(S): | Ultimate Classic Construction | COUNTY | Worcester |
|---|---|---|---|
| ADDRESS: | c/o Alan M. Cohen, Esquire | | |
| | 550 Worcester Road | DEFENDANT(S): | Blackboard Specialty Insurance Company f/k/a Hamilton Specialty Insurance |
| | Framingham, MA 01702 | | Company, York Risk Services Group, Inc., and Sedgwick, Inc. |
| ATTORNEY: | Alan M. Cohen | | |
| ADDRESS: | Law Offices of Alan M. Cohen LLC | ADDRESS: | 1209 Orange Street, Wilmington, DE 19801 |
| | 550 Worcester Road | | One Upper Pond Road, Bldg. F, 4th Floor, Parsippany, NJ 10038 |
| | Framingham, MA 01702 | | 8125 Sedgwick Way, Memphis, TN 38125 |
| BBO: | 088375 | | |

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| A06 | Insurance Contract | F | ☐ YES   ☒ NO |

*If "Other" please describe:

| Is there a claim under G.L. c. 93A? | Is this a class action under Mass. R. Civ. P. 23? |
|---|---|
| ☒ YES   ☐ NO | ☐ YES   ☒ NO |

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ......................................................................... $_____
2. Total doctor expenses .......................................................................... $_____
3. Total chiropractic expenses .................................................................. $_____
4. Total physical therapy expenses ........................................................... $_____
5. Total other expenses (describe below) ................................................. $_____
                                                                 Subtotal (A): $_____

B. Documented lost wages and compensation to date ....................................... $_____
C. Documented property damages to date ......................................................... $_____
D. Reasonably anticipated future medical and hospital expenses ....................... $_____
E. Reasonably anticipated lost wages .............................................................. $_____
F. Other documented items of damages (describe below) .................................. $_____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

                                                      TOTAL (A-F):$_____

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

Provide a detailed description of claim(s):

                                                      TOTAL: $ Excess of 50K

Services performed                      Principal amount due

Signature of Attorney/ Unrepresented Plaintiff: X _____    Date: 7/14/20

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

#### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____    Date: 7/14/20

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                              SUPERIOR COURT
                                           CIVIL ACTION NO.

ULTIMATE CLASSIC CONSTRUCTION INC.,
      Plaintiff
v.                                 COMPLAINT

BLACKBOARD SPECIALTY INSURANCE COMPANY
F/K/A HAMILTON SPECIALTY INSURANCE COMPANY,
YORK RISK SERVICES GROUP, INC., AND SEDGWICK,
INC.
                   COUNT ONE - BREACH OF CONTRACT

1.   The plaintiff, ULTIMATE CLASSIC CONSTRUCTION INC., is a now

dissolved Massachusetts corporation with a usual place of

business located in Somerville, Middlesex County, MA

("plaintiff").

2.   At all times relevant hereto, plaintiff was an existing

Massachusetts corporation on file with the Massachusetts

Secretary of State Corporations Division.

3.   The defendant BLACKBOARD SPECIALTY INSURANCE COMPANY F/K/A

HAMILTON SPECIALTY INSURANCE COMPANY is a Delaware corporation

with a usual place of business located at 1209 Orange Street,

Wilmington, DE 19801 and is a merchant as defined by the Uniform

Commercial Code ("BLACKBOARD").

4.   The defendant YORK RISK SERVICES GROUP, INC. is a New York

corporation with a usual place of business located at One Upper

Pond Road, Building F, 4th Floor, Parsippany, NJ 10038 and is a

merchant as defined by the Uniform Commercial Code ("YORK").

1

5. The defendant SEDGEWICK, INC. is a New York corporation
with a usual place of business located at 8125 Sedgwick Way,
Memphis, TN 38125 and is a merchant as defined by the Uniform
Commercial Code ("SEDGEWICK").

6. Plaintiff purchased and defendant BLACKBOARD issued general
liability coverage to plaintiff in Massachusetts for the period
from July 12, 2017 to July 12, 2018.

7. On or about January 19, 2018, plaintiff suffered a loss
resulting from its negligent construction services including its
creation of a drywell for an approximately 2375 square foot
condominium purchased for $1,399,999 on or about November 16,
2017 at 301 Huron Avenue, Cambridge, MA 02138 ("premises") which
rendered uninhabitable the lower level of said Unit containing
two bedrooms, a family/media room, bathroom and laundry.

8. As a result of the drywell backing up the sump pump, the
sump pump was pumping ground water that had nowhere to go and as
a result a substantial amount of the foundation was under water.

9. On information and belief, the plaintiff alleges and avers
that the owner of said Unit has indicated that the plaintiff
could face exposure from the owner's loss of the property's
habitable use.

10. Plaintiff provided a warranty to the owner.

11. The plaintiff is obligated to the owner for the damages
caused by plaintiff's negligent work.

2

12. In addition, plaintiff alleges and avers that it could face exposure for the owner's loss of the property's habitable use.

13. Plaintiff promptly filed a claim with HAMILTON SPECIALTY INSURANCE COMPANY which on February 1, 2018 changed its name to BLACKBOARD SPECIALTY INSURANCE COMPANY.

14. On or about March 15, 2018, due to HAMILTON SPECIALTY INSURANCE COMPANY, now BLACKBOARD's failure to perform its obligations pursuant to the policy including but not limited to proper investigation, settlement and payment of its claim, plaintiff retained prior counsel to prosecute the claim on behalf of plaintiff.

15. In response to plaintiff's repeated requests for BLACKBOARD to properly respond to the claim, BLACKBOARD, through its adjuster SEDGEWICK, retained the engineering firm EFI Global to perform an assessment of the loss.

16. On May 14, 2018, EFI Global performed an assessment of the loss and issued its Structural Engineering Report which states in its Results Of The Investigation (Conclusions) on Page 5 that "It is EFI's opinion that the water intrusion was caused by an inadequately designed and constructed drywell, which allowed water to flow from the drywell through the sump pump discharge pipe, and into the basement." (Emphasis Added).

17. On or about June 1, 2018, plaintiff was informed that the claim had been transferred to defendant YORK.

3

18. On information and belief, the plaintiff alleges and avers that Mr. Green acting on behalf of the defendants notified a man named Max Alves who was working for the plaintiff that the defendants were liable to the plaintiff for the damages.

19. In reasonable reliance thereon, the plaintiff continued to expend monies to repair the damage to the Unit.

20. On June 14, 2018, plaintiff, through prior counsel, sent YORK a c.93A demand letter.

21. On June 29, 2018, plaintiff through prior counsel sent YORK a second c.93A demand letter.

22. On July 13, 2018, defendants acknowledged via email having received plaintiff's June 14, 2018 c. 93A demand letter.

23. On or about September 1, 2019, SEDGEWICK was acquired by YORK.

24. On April 24, 2020, plaintiff through counsel herein sent YORK and HAMILTON, now BLACKBOARD, a third demand letter.

25. On June 29, 2020, defendants acknowledged receipt of plaintiff's April 24, 2020 demand letter in a voicemail to plaintiff's counsel.

26. From Friday, July 13, 2018 at which time the defendants acknowledged receiving the June 14, 2018 demand letter through July 1, 2020, the defendants and plaintiff's counsel have exchanged emails pursuant to which the defendants have continued to fail to issue either a written acknowledgement or denial of

4

coverage or make any, never mind a reasonable offer of settlement.

27.   Liability for the loss to the premises has been established.

28.   The loss is a qualifying loss pursuant to the policy.

29.   Damage to the premises caused by plaintiff's work for which it has directly or indirectly paid and/or for which it is responsible is at least Three Hundred Eighty-Three Thousand Eight Hundred Twenty-Seven and 62/100 ($383,827.62) Dollars.

30.   The defendants breached their contract of insurance by failing to pay a covered claim on a policy of insurance for which the plaintiff had paid its premiums.

31.   Plaintiff satisfied all of the conditions precedent to the payment of its claim by the defendants.

32.   Plaintiff has suffered and continues to suffer monetary damages due to the failure of defendants to investigate, settle and pay its claim and/or otherwise perform their obligations to plaintiff pursuant to the policy.

33.   Plaintiff made demand upon the defendants, but said defendants have failed, refused and/or neglected and continue to fail, refuse and/or neglect to pay said sum or any part thereof.

WHEREFORE, the plaintiff demands judgment against the defendants BLACKBOARD SPECIALTY INSURANCE COMPANY F/K/A HAMILTON SPECIALTY INSURANCE COMPANY, YORK RISK SERVICES GROUP, INC., AND

5

SEDGWICK, INC., jointly and severally in an amount sufficient to
fully compensate the plaintiff for the damages that it has
incurred and continues to incur, including but not limited to
consequential and incidental damages, arising from the
defendants' breach of contract and together with statutory
interest in the amount of 12% per annum from date of demand and
court costs.

COUNT TWO - GOOD FAITH

34.  Plaintiff realleges and reavers the allegations set forth
in paragraphs one through thirty-three of this Complaint and
incorporate same by reference as if fully stated herein.

35.  Implied in every contract is the covenant of good faith and
fair dealing.

36.  On information and belief, plaintiff alleges that the
defendants, by their actions and inactions breached the covenant
of good faith and fair dealing.

WHEREFORE, the plaintiff demands judgment against the
defendants BLACKBOARD SPECIALTY INSURANCE COMPANY F/K/A HAMILTON
SPECIALTY INSURANCE COMPANY, YORK RISK SERVICES GROUP, INC., AND
SEDGWICK, INC., jointly and severally in an amount sufficient to
fully compensate the plaintiff for the damages that it has
incurred and continues to incur, together with consequential and
incidental damages arising from the defendants' breach of

6

contract and together with statutory interest in the amount of
12% per annum from date of demand and court costs.

COUNT THREE - 176D and 93A

37.  The plaintiff realleges and reavers the allegations set
forth in paragraphs one through thirty-six of this Complaint and
incorporate same by reference as if fully stated herein.

38.  Defendants have failed to acknowledge and act reasonably
promptly upon communications with respect to claims arising
under plaintiff's insurance policy.

39.  Defendants have failed to adopt and implement reasonable
standards for the prompt investigation of plaintiff's claim
arising under plaintiff's insurance policy.

40.  Defendants have failed to affirm or deny coverage of claims
within a reasonable time after proof of loss statement had been
completed.

41.  Defendants have failed to effectuate prompt, fair and
equitable settlement of plaintiff's claim in which liability has
become reasonably clear.

42.  Defendants have compelled plaintiff to institute litigation
to recover amounts due under plaintiff's insurance policy.

43.  Defendants have failed to provide promptly a reasonable
explanation of the basis in the policy in relation to the facts
or applicable law for denial of a claim or for the offer of a
compromise settlement.

7

44. As a result of the defendants' joint and several failures
to comply with their obligations set forth in c. 176D § 3(9),
the plaintiff has incurred damages

45. The plaintiff is engaged in a trade or business within the
Commonwealth of Massachusetts.

46. The defendants are each engaged in a trade or business
within the Commonwealth of Massachusetts.

47. On information and belief, plaintiff alleges and avers that
the defendants by their actions and inactions have knowingly,
negligently and/or willfully committed an unfair and deceptive
trade act or practice in violation of M.G.L. c 176D Section 3(9)
and M.G.L. c 93A Sections 2 and 11.

48. As a result of the defendants' wrongful unfair and
deceptive trade acts or practices, the plaintiff has suffered
actual damages.

WHEREFORE, the plaintiff demands judgment against the
defendants BLACKBOARD SPECIALTY INSURANCE COMPANY F/K/A HAMILTON
SPECIALTY INSURANCE COMPANY, YORK RISK SERVICES GROUP, INC., AND
SEDGWICK, INC., jointly and severally in a principal amount
triple the amount sufficient to fully compensate the plaintiff
for the damages that it has incurred and continues to incur,
including but not limited to consequential and incidental
damages arising from the defendants' breach of contract and
together with statutory interest in the amount of 12% per annum

from date of demand, reasonable attorney's fees and court costs. Alternatively, if the Court concludes that the defendants negligently violated c. 93A §§ 2 and 11, plaintiff prays that judgment enter against defendants BLACKBOARD SPECIALTY INSURANCE COMPANY F/K/A HAMILTON SPECIALTY INSURANCE COMPANY, YORK RISK SERVICES GROUP, INC., AND SEDGWICK, INC., jointly and severally in a principal amount sufficient to fully compensate the plaintiff for the damages that it has incurred and continues to incur, including but not limited to consequential and incidental damages arising from the defendants' breach of contract and together with statutory interest in the amount of 12% per annum from date of demand, reasonable attorney's fees and court costs.

ULTIMATE CLASSIC CONSTRUCTION INC.
By its attorney,

Alan M. Cohen BBO # 088375
Glenn Wegrzyn BBO # 676398
LAW OFFICES OF ALAN M. COHEN LLC
550 Worcester Road
Framingham, MA 01702
(508) 620-6900
acohen@collections-law.com

9

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                              SUPERIOR COURT
                                           CIVIL ACTION NO.

ULTIMATE CLASSIC CONSTRUCTION INC.,
     Plaintiff
v.

BLACKBOARD SPECIALTY INSURANCE COMPANY
F/K/A HAMILTON SPECIALTY INSURANCE COMPANY,
YORK RISK SERVICES GROUP, INC., AND SEDGWICK,
INC.

AFFIDAVIT OF LINCOLN FONTES

I, LINCOLN FONTES, being duly sworn do hereby say and depose
as follows:

1.   I am the President of the plaintiff and am familiar with
the January 19, 2018 loss and the subsequent claim for insurance
payment.

2.   At all times relevant hereto, plaintiff was an existing
Massachusetts corporation on file with the Massachusetts
Secretary of State Corporations Division.

3.   The defendant BLACKBOARD SPECIALTY INSURANCE COMPANY F/K/A
HAMILTON SPECIALTY INSURANCE COMPANY is a Delaware corporation
with a usual place of business located at 1209 Orange Street,
Wilmington, DE 19801 and is a merchant as defined by the Uniform
Commercial Code ("BLACKBOARD").

4.   The defendant YORK RISK SERVICES GROUP, INC. is a New York
corporation with a usual place of business located at One Upper

1

Pond Road, Building F, 4th Floor, Parsippany, NJ 10038 and is a merchant as defined by the Uniform Commercial Code ("YORK").

5.    The defendant SEDGEWICK, INC. is a New York corporation with a usual place of business located at 8125 Sedgwick Way, Memphis, TN 38125 and is a merchant as defined by the Uniform Commercial Code ("SEDGEWICK").

6.    Plaintiff purchased and defendant BLACKBOARD issued general liability coverage to plaintiff in Massachusetts for the period from July 12, 2017 to July 12, 2018, a copy of the General Liability Binder and Declarations ("policy") are annexed hereto and incorporated herein as "A".

7.    On or about January 19, 2018, plaintiff suffered a loss resulting from its negligent construction services including its creation of a drywell for an approximately 2375 square foot condominium purchased for $1,399,999 on or about November 16, 2017 at 301 Huron Avenue, Cambridge, MA 02138 ("premises") which rendered uninhabitable the lower level of said Unit containing two bedrooms, a family/media room, bathroom and laundry, a copy of the Structural Engineering Report by EFI Global for the loss is annexed hereto and incorporated herein as "B".

8.    As a result of the drywell backing up the sump pump, the sump pump was pumping ground water that had nowhere to go and as a result a substantial amount of the foundation was under water.

2

9.   On information and belief, the plaintiff alleges and avers that the owner of said Unit has indicated that the plaintiff could face exposure from the owner's loss of the property's habitable use.

10.   Plaintiff provided a warranty to the owner.

11.   The plaintiff is obligated to the owner for the damages caused by plaintiff's negligent work.

12.   In addition, plaintiff alleges and avers that it could face exposure for the owner's loss of the property's habitable use.

13.   Plaintiff promptly filed a claim with HAMILTON SPECIALTY INSURANCE COMPANY which on February 1, 2018 changed its name to BLACKBOARD SPECIALTY INSURANCE COMPANY, a copy of the Report On Examination Of Hamilton Specialty Insurance Company wherein the defendant's name change is found on page 23 is annexed hereto and incorporated herein as "C".

14.   On or about March 15, 2018, due to HAMILTON SPECIALTY INSURANCE COMPANY, now BLACKBOARD's failure to perform its obligations pursuant to the policy including but not limited to proper investigation, settlement and payment of its claim, plaintiff retained prior counsel to prosecute the claim on behalf of plaintiff.

15.   In response to plaintiff's repeated requests for BLACKBOARD to properly respond to the claim, BLACKBOARD, through its

adjuster SEDGEWICK, retained the engineering firm EFI Global to

perform an assessment of the loss.

16.   On May 14, 2018, EFI Global performed an assessment of the

loss and issued its Structural Engineering Report which states

in its Results Of The Investigation (Conclusions) on Page 5 that

"It is EFI's opinion that the water intrusion was caused by an

inadequately designed and constructed drywell, which allowed

water to flow from the drywell through the sump pump discharge

pipe, and into the basement." (Emphasis Added).

17.   On or about June 1, 2018, plaintiff was informed that the

claim had been transferred to defendant YORK.

18.   On information and belief, the plaintiff alleges and avers

that Mr. Green acting on behalf of the defendant notified a man

named Max Alves who was working for the plaintiff that the

defendant was liable to the plaintiff for the damages.

19.   In reasonable reliance thereon, the plaintiff continued to

expend monies to repair the damage to the Unit.

20.   On June 14, 2018, plaintiff, through prior counsel, sent

YORK a c.93A demand letter annexed hereto and incorporated

herein as "D".

21.   On June 29, 2018, plaintiff through prior counsel sent YORK

a second c.93A demand letter annexed hereto and incorporated

herein as "E".

22. On July 13, 2018, defendant acknowledged via email having received plaintiff's June 14, 2018 c. 93A demand letter, a copy of which is annexed hereto and incorporated herein as "F".

23. On or about September 1, 2019, SEDGEWICK was acquired by YORK, a copy of online news article from the Claims Journal annexed hereto and incorporated herein as "G".

24. On April 24, 2020, plaintiff through counsel herein sent YORK and HAMILTON, now BLACKBOARD, a third demand letter, a copy of which is annexed hereto and incorporated herein as "H".

25. On June 29, 2020, defendant acknowledged receipt of plaintiff's April 24, 2020 demand letter in a voicemail to plaintiff's counsel.

26. From Friday, July 13, 2018 at which time the defendant acknowledged receiving the June 14, 2018 demand letter through July 1, 2020, the defendant and plaintiff's counsel have exchanged emails pursuant to which the defendant has continued to fail to issue either a written acknowledgement or denial of coverage or make any, never mind a reasonable offer of settlement.

27. Liability for the loss to the premises has been established.

28. The loss is a qualifying loss pursuant to the policy.

29. Damage to the premises caused by plaintiff's work for which it has directly or indirectly paid and/or for which it is

5

responsible is at least Three Hundred Eighty-Three Thousand Eight Hundred Twenty-Seven and 62/100 ($383,827.62) Dollars, a copy of the accounting is annexed hereto and incorporated herein as "I".

30. The defendants breached their contract of insurance by failing to pay a covered claim on a policy of insurance for which the plaintiff had paid its premiums.

31. Plaintiff satisfied all of the conditions precedent to the payment of its claim by the defendants.

32. Plaintiff has suffered and continues to suffer monetary damages due to the failure of defendants to investigate, settle and pay its claim and/or otherwise perform their obligations to plaintiff pursuant to the policy.

33. Plaintiff made demand upon the defendants, but said defendants have failed, refused and/or neglected and continue to fail, refuse and/or neglect to pay said sum or any part thereof.

34. Implied in every contract is the covenant of good faith and fair dealing.

35. On information and belief, plaintiff alleges that the defendants, by their actions and inactions breached the covenant of good faith and fair dealing.

36. Defendants have failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under plaintiff's insurance policy.

37.  Defendants have failed to adopt and implement reasonable

standards for the prompt investigation of plaintiff's claim

arising under plaintiff's insurance policy.

38.  Defendants have failed to affirm or deny coverage of claims

within a reasonable time after proof of loss statement had been

completed.

39.  Defendants have failed to effectuate prompt, fair and

equitable settlement of plaintiff's claim in which liability has

become reasonably clear.

40.  Defendants have compelled plaintiff to institute litigation

to recover amounts due under plaintiff's insurance policy.

41.  Defendants have failed to provide promptly a reasonable

explanation of the basis in the policy in relation to the facts

or applicable law for denial of a claim or for the offer of a

compromise settlement.

42.  As a result of the defendants' joint and several failures

to comply with their obligations set forth in c. 176D § 3(9),

the plaintiff has incurred damages

43.  The plaintiff is engaged in a trade or business within the

Commonwealth of Massachusetts.

44.  The defendants are each engaged in a trade or business

within the Commonwealth of Massachusetts.

45.  On information and belief, plaintiff alleges and avers that

the defendants by their actions and inactions have knowingly,

7

negligently and/or willfully committed an unfair and deceptive

trade act or practice in violation of M.G.L. c 176D Section 3(9)

and M.G.L. c 93A Sections 2 and 11.

46.  As a result of the defendants' wrongful unfair and

deceptive trade acts or practices, the plaintiff has suffered

actual damages.


    SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 07-01-20
DAY OF JULY 2020.

                                    _____
                                    LINCOLN FONTES

8

# EXHIBIT A



# General Liability Binder

Expires: 10/10/2017
Transaction Type: New

Access
2 Rosenfeld Drive
Hopedale, MA 01747

T  508.902.9711 x227
F  774.396.0067

July 13, 2017

JULIANA MATOS
Discovery Insurance Agency
25 Lyannough Rd
Hyannis, MA 02601

## Overview

We have received the following General Liability Binder for the captioned insured. Please review carefully and advise at your earliest convenience.

| | |
|---|---|
| POLICY NUMBER: | AAHS1000014100 |
| POLICY PERIOD: | From 7/12/2017 to 7/12/2018 |
| CARRIER: | Hamilton Specialty Insurance Company |
| | View A.M. Best Rating |
| APPLICANT: | ULTIMATE CLASSIC CONSTRUCTION INC |
| MAILING ADDRESS: | 68 BONAIR STREET APT 3 Somerville, MA 02145 |
| COMMISSION: | 10.000% |
| MINIMUM EARNED PREMIUM: | 25% |

| | |
|---|---|
| Premium: | $797.00 |
| Fees*: | $135.00 |
| Taxes**: | $31.88 |
| Total: | $963.88 |

State Tax and fees are subject to change due to state legislation at the time of binding.



# General Liability Coverage

## Limits

| Type | Limit |
|------|-------|
| General Aggregate | $2,000,000 |
| Products & Completed Operations | $2,000,000 |
| Each Occurrence | $1,000,000 |
| Personal & Advertising Injury | $1,000,000 |
| Damage to Rented Premises | $500,000 |
| Medical Expenses | $10,000 |

## Deductible

| Type | Amount |
|------|--------|
| None | |

## Class Codes

| Territory | Class Code | Description | Exposure | Basis | Rate | Premium |
|-----------|-----------|-------------|----------|-------|------|---------|
| MA-514: Boston, Cambridge, Everett, Chelsea, Revere and Sommerville | 91340 | (91340) Carpentry - construction of residential property not exceeding three stories in height | 22,000 | Payroll | Prem/Ops Rate = 17.0080 Prod/Ops Rate = 19.2080 | $797.00 |



# Forms

| Form | Edition | Description |
|------|---------|-------------|
| HU0101 | (03/15) | Service of Suit |
| HU0102 | (03/15) | Claims Handling Notice |
| HU0104 | (03/15) | Policyholder Disclosure Acceptance / Rejection of Terrorism Insurance Coverage |
| HUDS01 | (03/15) | COMMON POLICY DECLARATIONS |
| HUDS02 | (03/15) | Signature Endorsement |
| IL0003 | (09/08) | CALCULATION OF PREMIUM |
| IL0017 | (11/98) | COMMON POLICY CONDITIONS |
| ILP001 | (01/04) | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| CG0001 | (04/13) | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG2101 | (11/85) | EXCLUSION - ATHLETIC OR SPORTS PARTICIPANTS |
| CG2107 | (05/14) | Exclusion - Access or Disclosure  of Confidential or Personal Info & Data-Related Liability - Limited BI Exception Not Included |
| CG2147 | (12/07) | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG2152 | (04/13) | EXCLUSION - FINANCIAL SERVICES |
| CG2154 | (01/16) | EXCLUSION - DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM |
| CG2165 | (12/04) | TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION |
| CG2167 | (12/04) | FUNGI OR BACTERIA EXCLUSION |
| CG2173 | (01/15) | EXCLUSION OF CERTIFIED ACTS OF TERRORISM |
| CG2166 | (12/04) | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS |
| CG2193 | (03/05) | SILICA OR SILICA-RELATED DUST EXCLUSION |
| CG2233 | (04/13) | EXCLUSION - TESTING OR CONSULTING ERRORS AND OMISSIONS |
| CG2234 | (04/13) | EXCLUSION - CONSTRUCTION MANAGEMENT ERRORS AND OMISSIONS |
| CG2243 | (04/13) | EXCLUSION - ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY |
| CG2279 | (04/13) | EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY |
| CG2284 | (11/94) | MASSACHUSETTS CHANGES - COVERAGE FOR LEAD POISONING ENDORSEMENT |
| CGP006 | (03/05) | EXCLUSION - SILICA OR SILICA-RELATED DUST  ADVISORY NOTICE TO POLICYHOLDERS |
| CL0501 | (05/15) | SPECIAL CONDITIONS - SUBCONTRACTORS |
| CL0502 | (05/15) | SUBCONTRACTORS - DEFINITION OF ADEQUATELY INSURED |
| CL2107 | (03/15) | Lead Exclusion |
| CL2108 | (03/15) | ASBESTOS EXCLUSION |
| CL2114 | (05/15) | NEW RESIDENTIAL CONSTRUCTION LIMITATION |
| CL2115 | (05/15) | CROSS SUITS LIABILITY EXCLUSION |
| CL2116 | (05/15) | EARTH MOVEMENT EXCLUSION |
| CL2120 | (05/15) | EXCLUSION INJURY TO INDEPENDENT CONTRACTORS |
| CL2126 | (02/16) | Professional Medical Services Exclusion |
| CL2402 | (03/15) | Communicable Disease Limitation |
| CLDS01 | (03/15) | COMMERCIAL GENERAL LIABILITY DECLARATIONS |
| HUN117 | (05/15) | COMMUNICABLE DISEASE EXCLUSION ENDORSEMENT ADVISORY NOTICE TO POLICYHOLDERS |



| IL 0021 | (09/08) | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
|---------|---------|------------------------------------------------|

# Conditions

| |
|---|
| The insured's premises and operations are subject to inspection and compliance with any resulting recommendations. |
| Premium charges for Additional Insured(s) and Waiver of Subrogation may be fully earned at inception. |
| Unless otherwise indicated, premium is due within 20 days of binding. Premiums not received within this time period may result in Notice of Cancellation. |
| This is the premium due at inception. The final premium will be determined after an audit of the insured's records. Final adjustments to the premium will be made according to the rate(s) on the policy. Adjustments will only be made for Additional Premiums. No return premium shall be forthcoming. |
| Once the policy is bound some premium will be earned (as reflected in minimum earned premium). There are no flat Cancellations allowed. |

# *Fees

| State | Fee | Taxable | Amount |
|-------|-----|---------|--------|
| MA | AmWINS Inspection Fee | No | $45.00 |
| MA | AmWINS Service Fee | No | $90.00 |
| Total Fees Due | | | $135.00 |

# **Taxes

| State | Description | Taxable Premium | Taxable Fee | Tax Basis | Rate | Amount |
|-------|-------------|-----------------|-------------|-----------|------|--------|
| MA | Surplus Lines Tax | $797.00 | $0.00 | $797.00 | 4.000% | $31.88 |
| Total Surplus Lines Taxes Due | | | | | | $31.88 |

Sincerely,

**Nancie Langlais**
Senior Vice President | AmWINS Access Insurance Services, LLC
T  508.902.9711 x227  |  F  774.396.0067  |  Nancie.Langlais@amwins.com
2 Rosenfeld Drive  |  Hopedale, MA 01747  |  amwins.com

An AmWINS Group Company

 HAMILTON SPECIALTY

Hamilton Specialty Insurance Company

**AmWINS**
Access

1 Gresham Landing
Stockbridge, GA 30281
678-586-2200

POLICY NUMBER: AAHS1000014100                    HU DS 01 03 15

PREVIOUS POLICY NUMBER:

# COMMON POLICY DECLARATIONS

Named Insured: ULTIMATE CLASSIC CONSTRUCTION INC.

Named Insured's Mailing Address:   68 BONAIR STREET, APT 3          NO FLAT CANCELLATION
                                   SOMERVILLE, MA 02145

Producer Name And Address:  AMWINS ACCESS INSURANCE SERVICES, LLC
                            2 ROSENFELD DRIVE
                            HOPEDALE, MA 01747

Producer Code:

Policy Period: From 07/12/2017    To:07/12/2018    AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS

Business Description:    CARPENTRY

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE
AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS
INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

|  | PREMIUM |
|---|---|
| COMMERCIAL PROPERTY COVERAGE PART | |
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $797.00 |
| COMMERCIAL INLAND MARINE COVERAGE PART | |
| COMMERCIAL LIQUOR LIABILITY COVERAGE PART | |
| OTHER: | This policy is insured by a company which is not admitted to transact insurance in the commonwealth, is not supervised by the commissioner of insurance and, in the event of an insolvency of such company, a loss shall not be paid by the Massachusetts Insurers Insolvency Fund under chapter 175D. |
| TRIA PREMIUM | REJECTED |
| TAXES AND SURCHARGES, if any    INSPECTION FEE | $45.00 |
| SERVICE FEE | $90.00 |
| SURPLUS LINES | $31.88 |
| | |
| TOTAL | $963.88 |
| MINIMUM PREMIUM PAYABLE AT INCEPTION | $797.00 |
| MINIMUM EARNED PREMIUM  25% | |

HU DS 01 03 15   Includes copyrighted material of Insurance Services Office, Inc. with its        Page 1 of 2
permission. © 2015 Hamilton U.S. Holdings, Inc. All Rights Reserved.
May not be copied without permission.



HAMILTON SPECIALTY

Hamilton Specialty Insurance Company

★AmWINS
Access

1 Gresham Landing
Stockbridge, GA 30281
678-586-2200

---

**Schedule Of Forms And Endorsements Attached As Part Of This Policy:**

| | | |
|---|---|---|
| HU 01 01 01 16 | Service of Suit |
| HU 01 02 10 16 | Claims Handling Notice |
| HU DS 02 03 15 | Signature Endorsement |
| HU N 117 05 15 | Communicable Disease Excl. Endorsement Advisory Notice To Policyholders |
| IL 00 03 9-08 | Calculation Of Premium |
| IL 00 17 11-98 | Common Policy Conditions |
| IL 00 21 9-08 | Nuclear Energy Excl |
| IL P 001 1-04 | US Treasury Department's Office of OFAC |
| CL DS 01 03 15 | Commercial General Liability Coverage Part Supplemental Declarations |
| CL 05 01 05 15 | Special Conditions - Subcontractors |
| CL 05 02 03 15 | Subcontractors - Definition Of Adequately Insured Endorsement |
| CL 21 07 03 15 | Lead Exclusion |
| CL 21 08 03 15 | Asbestos Exclusion |
| CL 21 14 05 15 | New Residential Construction And Residential Conversion Limitation Endorsement |
| CL 21 15 05 15 | Cross Suits Liability Exclusion |
| CL 21 16 05 15 | Earth Movement Exclusion |
| CL 21 20 05 15 | Injury To Independent Contractors And Subcontractors Exclusion |
| CL 21 26 02 16 | Professional Medical Services Exclusion |
| CL 24 02 03 15 | Communicable Disease Limitation Endorsement |
| CG 00 01 4-13 | General Liab Cov |
| CG 21 01 11-85 | Excl-Athletic-Sports Partic |
| CG 21 07 05 14 | Excl. - Access Or Disclosure of Confidential Or Personal Info. And Data-Related... |
| CG 21 47 12-07 | Employment-Related Practices Excl |
| CG 21 52 4-13 | Excl-Financial Services .. |
| CG 21 54 1-96 | Excl-Designated Ops-Consolidated |
| CG 21 65 12-04 | Pollution Excl-Heating Equip |
| CG 21 67 12-04 | Fungi Or Bacteria Excl |
| CG 21 73 1-15 | Exclusion-Certified Acts Of Terrorism |
| CG 21 86 12-04 | Excl-Exterior Insulation And Finish Systems |
| CG 21 96 3-05 | Silica Or Silica-Related Dust Excl |
| CG 22 33 4-13 | Excl-Testing-Consulting E&O |

## ADDITIONAL FORMS

---

THESE DECLARATIONS, TOGETHER WITH THE ATTACHED SIGNATURE ENDORSEMENT, SCHEDULE OF
FORMS AND ENDORSEMENTS, AND ANY FORMS AND ENDORSEMENTS THAT WE MAY LATER ATTACH
TO REFLECT CHANGES, MAKE UP AND COMPLETE THE ABOVE NUMBERED POLICY.





Access

1 Gresham Landing
Stockbridge, GA 30281
678-586-2200

Schedule Of Forms And Endorsements Attached As Part Of This Policy:

```
CG 22 34  4-13      Excl-Const Mgmt E&O
CG 22 43  4-13      Excl-Engineers-Arch-Surv Prof
CG 22 79  4-13      Excl-Contractors-Prof Liab
CG 22 84 11 94      HA Changes - Supplemental Coverage For Lead Poisoning Endorsement
CG P 006 03 05      Excl. - Silica Or Silica-Related Dust Advisory Notice to Policyholders
```

ADDITIONAL FORMS

THESE DECLARATIONS, TOGETHER WITH THE ATTACHED SIGNATURE ENDORSEMENT, SCHEDULE OF
FORMS AND ENDORSEMENTS, AND ANY FORMS AND ENDORSEMENTS THAT WE MAY LATER ATTACH
TO REFLECT CHANGES, MAKE UP AND COMPLETE THE ABOVE NUMBERED POLICY.

INTERLINE
HU 01 01 01 16

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# SERVICE OF SUIT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND COVERAGE PART
BUSINESSOWNERS POLICY
MISCELLANEOUS PROFESSIONAL LIABILITY POLICY

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore we hereby designate the Commissioner, Superintendent or Director of Insurance or other officer specified for that purpose in the statute, and his successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit, contract of insurance and hereby designate the Corporate Secretary of Hamilton Specialty Insurance Company, 1209 Orange Street, Wilmington, DE 19801, as the entity to whom said officer is authorized to mail such process or a true copy thereof.

Includes copyrighted material of Insurance Services Office, Inc. with its permission. © 2016 Hamilton U.S. Holdings, Inc. All Rights Reserved. May not be copied without permission.



HAMILTON

Hamilton Specialty Insurance Company



Access

1 Gresham Landing
Stockbridge, GA 30281
678-586-2200

POLICY NUMBER: AAHS1000014100

HU 01 02 10 16

# POLICYHOLDER NOTICE

Any notices that you are required to provide pursuant to the terms and conditions of the insurance policy to which this endorsement attaches must be made to the claims administrator identified below using the following contact information:

| | |
|---|---|
| Claim Contact: | inTrust |
| Claims Email: | CLTPA@cl-na.com |
| Mailing Address: | inTrust<br>P.O. Box 703689<br>Dallas, TX 75370 |
| Toll Free Main Number: | 1-800-998-5741 |
| Main Office Number: | 1-214-488-5139 |
| Claim Reporting Fax Number: | 1-844-899-0049 |

All other terms and conditions of the policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc.
with its permission. © 2016 Hamilton U.S. Holdings, Inc. All Rights
Reserved. May not be copied without permission.



**AmWINS**
Access

1 Gresham Landing
Stockbridge, GA 30281
678-586-2200

POLICY NUMBER: AAHS1000014100                                   HU DS 02 03 15

NAMED INSURED: ULTIMATE CLASSIC CONSTRUCTION INC.

# SIGNATURE ENDORSEMENT

Authorization: In Witness Whereof, The Company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless countersigned by an authorized representative of the Company, where required.

HAMILTON SPECIALTY INSURANCE COMPANY

_____                              _____
Secretary                                                          President

THIS SIGNATURE ENDORSEMENT, TOGETHER WITH THE DECLARATIONS, COMMON POLICY CONDITIONS, COVERAGE FORM(S), AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.

# COMMUNICABLE DISEASE EXCLUSION ENDORSEMENT
# ADVISORY NOTICE TO POLICYHOLDERS

This Notice does not form a part of your insurance contract. No coverage is provided by this Notice, nor can it be construed to replace any provisions of your policy (including its endorsements). If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) shall prevail.

Carefully read your policy, including the endorsements attached to your policy.

This Notice provides information concerning the following new endorsements, which applies to your renewal policy being issued by us:

<div align="center">

Communicable Disease Exclusion Endorsement CG 21 32

Communicable Disease Exclusion Endorsement CG 33 76

Communicable Disease Limitation Endorsement CL 24 02

</div>

When a Communicable Disease Exclusion or Limitation endorsement is attached to your policy, coverage is excluded for liability arising out of the actual or alleged transmission of a communicable disease.

The attachment of any of these endorsements may result in a reduction of coverage.

IL 00 03 09 08

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

    CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    CRIME AND FIDELITY COVERAGE PART
    EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
    EQUIPMENT BREAKDOWN COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

Copyright, ISO Properties, Inc., 2007
AmWINS Access

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc., 1998

AmWINS Access

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

   (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

   (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

   (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

   (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

 Copyright, ISO Properties, Inc., 2007
AmWINS Access

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    (a) Any "nuclear reactor";

    (b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

    (c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    (d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

    Copyright, ISO Properties, Inc., 2007    IL 00 21 09 08

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
## ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. Please read this Notice carefully.

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Copyright, ISO Properties, Inc., 2004
AmWINS Access

 HAMILTON SPECIALTY

Hamilton Specialty Insurance Company

 **AmWINS** Access

1 Gresham Landing
Stockbridge, GA 30281
678-586-2200

POLICY NUMBER:  AAHS1000014100                          CL DS 01 03 15

NAMED INSURED: ULTIMATE CLASSIC CONSTRUCTION INC.

# COMMERCIAL GENERAL LIABILITY COVERAGE PART
# SUPPLEMENTAL DECLARATIONS

| LIMITS OF INSURANCE | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $1,000,000 | |
| DAMAGE TO PREMISES | | |
| RENTED TO YOU LIMIT | $500,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $10,000 | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | | $2,000,000 |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | | $2,000,000 |

| ALL PREMISES YOU OWN, RENT OR OCCUPY | |
|---|---|
| LOCATION NUMBER | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 1/1 | 68 BONAIR ST, SOMERVILLE, MA 02145 |

| CLASSIFICATION AND PREMIUM | | | | | | | |
|---|---|---|---|---|---|---|---|
| LOCA-TION # | CLASSIFICATION | CODE NO. | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
| | | | | Prem/ Ops | Prod/Comp Ops | Prem/ Ops | Prod/Comp Ops |
| 1/1 | CARPENTRY - CONSTRUCTION OF RESIDENTIAL PROPERTY NOT EXCEEDING THREE STORIES IN HEIGHT | 91340 | $22,000-P | $ 17.0080 | $ 19.2080 | $797.00 | $INCL |
| | | | | $ | $ | $ | $ |
| | | | | $ | $ | $ | $ |
| | | | | $ | $ | $ | $ |
| | | | | $ | $ | $ | $ |

| | | |
|---|---|---|
| | TOTAL PREMIUM (SUBJECT TO AUDIT) | $797.00 |
| PREMIUM SHOWN IS PAYABLE | AT INCEPTION | $797.00 |
| | AT EACH ANNIVERSARY (IF POLICY PERIOD IS MORE THAN ONE YEAR AND PREMIUM IS PAID IN ANNUAL INSTALLMENTS) | |

Policy is Auditable (Y/N)  Y

CL DS 01 03 15    Includes copyrighted material of Insurance Services Office, Inc. with its      Page 1 of 2
permission. © 2015 Hamilton U.S. Holdings, Inc. All Rights Reserved.
May not be copied without permission.



HAMILTON SPECIALTY

Hamilton Specialty Insurance Company

**AmWINS**
Access

1 Gresham Landing
Stockbridge, GA 30281
678-586-2200

---

**FORM OF BUSINESS:**

INDIVIDUAL       PARTNERSHIP       JOINT VENTURE       TRUST

LIMITED LIABILITY COMPANY     X   ORGANIZATION, INCLUDING A CORPORATION (BUT NOT INCLUDING A PARTNERSHIP, JOINT VENTURE OR LIMITED LIABILITY COMPANY)

BUSINESS DESCRIPTION: CARPENTRY

---

Schedule Of Forms And Endorsements Attached As Part Of This Policy:

See schedule of Forms and Endorsements

---

THESE DECLARATIONS, TOGETHER WITH THE ATTACHED SIGNATURE ENDORSEMENT, SCHEDULE OF FORMS AND ENDORSEMENTS, AND ANY FORMS AND ENDORSEMENTS THAT WE MAY LATER ATTACH TO REFLECT CHANGES, MAKE UP AND COMPLETE THE ABOVE NUMBERED POLICY.

GENERAL LIABILITY
CL 05 01 05 15

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# SPECIAL CONDITIONS – SUBCONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following condition is added to SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS:

**SPECIAL CONDITIONS - SUBCONTRACTORS**

You will obtain Certificates of Insurance with Limits of Insurance equal to or greater than those provided by this Policy from all subcontractors or independent contractors prior to commencement of any work performed.

Failure to comply with this Special Condition does not alter the coverage provided by this Policy. However, should you fail to comply, a premium charge will be made. The premium charge will be computed by multiplying the "total cost" of all work sublet that fails to meet the above condition, by the rate per $1,000 of payroll for the applicable classification of the work performed.

If the policy does not contain the applicable classification and rate, we will multiply our usual and customary rate per $1,000 payroll for that classification, by the net modification factor, if any, applied to the policy rates.

For the purposes of the coverage provided by this policy, "total cost" means the cost of all labor, materials, and equipment furnished, used or delivered for use in the execution of the work, and all fees, allowances, bonuses or commissions earned, paid or due.

All other terms and conditions of this policy remain unchanged.

    Includes copyrighted material of Insurance Services Office, Inc. with its permission. © 2015 Hamilton U.S. Holdings, Inc. All Rights Reserved. May not be copied without permission.

GENERAL LIABILITY
CL 05 02 05 15

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# SUBCONTRACTORS – DEFINITION OF ADEQUATELY INSURED ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| | |
|---|---|
| Each Occurrence Limit | $ 1,000,000 |
| Personal and Advertising Injury Limit | $ 1,000,000 |
| Products-Completed Operations Aggregate Limit | $ 2,000,000 |
| General Aggregate Limit | $ 2,000,000 |

The policy is amended as follows:

A. Any classifications covered under in this policy designated in the Declarations or in any endorsement as Contractors - Subcontracted Work apply to that portion of the operations performed for the insured by "adequately insured" subcontractors.

B. Any subcontractor not "adequately insured" and whose work is not excluded by the policy will be considered an "employee" of the insured for the sole purpose of computing premium. Any such subcontractor will be rated under the most appropriate payroll classification as determined by us and a premium charge will be made using our rates effective at the inception of the policy.

For any subcontractor not "adequately insured", you must maintain records showing the labor cost of that subcontractor separate from the subcontractor's "total cost". If the labor cost of any subcontractor is not available at the time of the premium audit, sixty percent of the subcontractor's "total cost" will be considered labor cost (payroll).

C. As used in this endorsement, the following definitions are added to SECTION V – DEFINITIONS:

1. "Adequately insured" means:

   Covered by Commercial General Liability Insurance which:

   a. Is evidenced by an accurate certificate of insurance provided to you;

   b. Remains in force for the entire period during which all work is performed for you or on your behalf and which is maintained thereafter until all claims could have been made against you; and

   c. Provides for the coverages and limits shown in the Schedule above.

   If no limit of liability is in the above Schedule, then the limit of liability must be equal to the limit of liability stated on the Declarations page of this policy.

2. "Total cost" means the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work, and all fees, allowances, bonuses, or commissions earned, paid or due.

All other terms and conditions of the policy remain unchanged.

CL 05 02 05 15     Includes copyrighted material of Insurance Services Office, Inc. with its     Page 1 of 1
permission. © 2015 Hamilton U.S. Holdings, Inc. All Rights Reserved.
May not be copied without permission.

COMMERCIAL GENERAL LIABILITY
CL 21 07 03 15

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# LEAD EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM

This insurance does not apply to:

a. Actual or alleged "bodily injury" arising out of the ingestion, inhalation or absorption of lead in any form;

b. Actual or alleged "property damage", "personal and advertising injury", or "injury" arising out of any form of lead;

c. Any actual or alleged liability arising out of any form of lead and assumed by an insured under any written or oral contract or agreement;

d. Any loss, cost or expense arising out of any request, demand or order that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize in any way respond to or assess the effects of lead; or

e. Any loss, cost or expense arising out of any claim or "suit" by or on behalf of any governmental authority for damages resulting from testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or accessing the effects of lead.

All other terms and conditions remain unchanged.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM

This insurance does not apply to:

a. "Bodily injury";

b. "Property damage";

c. "Personal and advertising injury";

d. "Injury";

e. Expenses for "bodily injury";

f. Defense costs;

g. Fines; or

h. Any other damages

arising out of any actual, alleged, threatened ingestion, inhalation, absorption of or exposure to asbestos, asbestos products, asbestos fibers, asbestos dust or any asbestos-containing material.

This insurance will not pay for loss, cost or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of asbestos, asbestos products, asbestos fibers, asbestos dust or any asbestos-containing material by any insured or any other person or organization.

All other terms and conditions of the policy remain unchanged.

 Includes copyrighted material of Insurance Services Office, Inc. with its permission. © 2015 Hamilton U.S. Holdings, Inc. All Rights Reserved. May not be copied without permission.

GENERAL LIABILITY
CL 21 14 05 15

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# NEW RESIDENTIAL CONSTRUCTION AND RESIDENTIAL CONVERSION LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

I.   The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A – Bodily Injury And Property Damage Liability and Paragraph 2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury", or any other injury, loss or damage in any way connected with or arising out of "new residential construction", any roofing operations, or the conversion of a nonresidential structure into of any of the following:

A.   "Condominium" or "cooperative";

B.   "Apartment" or "apartment building";

C.   "Town house";

D.   "Tract home project"; or

E.   "Single family home"

whether such "New Residential Construction" or conversion work is or was performed by an insured, a person or entity to whom an insured owes an indemnity obligation, has agreed to indemnify or hold harmless, a person or entity to whom an "insured" is contractually obligated to add to this policy as an additional insured, or any other person or entity.

However, this exclusion does not apply to new construction or conversion work if the total number of units of "new residential construction" within a "development" or "tract home project" does not exceed 15 individual units. However, with respect to Paragraph E. ("single family home"), this exclusion does not apply to new construction or conversion work if the total number of units of "new residential construction" within a "development" does not exceed 30 individual units.

Except with respect to roofing remodeling, repair, or maintenance operations, this exclusion also does not apply to remodeling, repair or maintenance operations performed on any individual "apartment", "condominium", "town house", "single family house" or any other residential unit after it has been certified for occupancy or put to its intended use prior to the commencement of such work.

II.  For purposes of this endorsement, the following are added to Section V – DEFINITIONS of the Policy:

a.   "Apartment" means a self-contained single rental unit designed for human habitation having a separate mailing address located in a building containing two or more self-contained single rental units designed for human habitation each having a separate mailing address.

b. "Apartment Building" means a structure or structures containing two or more separate "Apartments," together with any common areas and appurtenant structures thereto.

c. "Condominium" means a residential property in which a resident's ownership consists of an undivided interest in common property within a multi-unit residential property, in addition to a separate interest in space comprising a unit. "Condominium" will include any individual unit, any model homes, any common areas and all appurtenant structures thereto.

d. "Cooperative" means a building with "apartments" owned by a corporation of tenants in which shares of expenses are calculated on the basis of the value of the tenant's "apartment". "Cooperative" includes both the "apartment" unit itself and any common areas of the building and all appurtenant structures thereto.

e. "Development" means a group of single-family or multiple-family dwellings, including" apartments", condominiums", "single family houses" or "town houses", built as a single construction project.

f. "New residential construction" means operations relating to construction of a building, multiple buildings, building unit or multiple building units, not previously occupied, and designed or intended for occupancy in whole or in part as a residence by a person, and shall include the land upon which such building(s) or building unit(s) is/are situated and any appurtenant structures thereto.

g. "Single family house" means a separate, free-standing house designed to be occupied by one family and any appurtenant structures thereto.

h. "Town house" means a "condominium" or "single family house" built in a row with other residential homes of the same or similar design with either a wall in common with another unit or a narrow space between units, together with any common areas, model homes and appurtenant structures thereto. "Town house" shall include row houses or row homes.

i. "Tract home project" means a development project in which a parcel of land is subdivided into more than ten lots, tracts, parcels or other division of land for the development, building or sale of freestanding one or multiple family dwellings.

All other terms and conditions of this policy remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# CROSS-SUITS LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to the policy:

This insurance does not apply to

a.   "bodily injury";

b.   "property damage";

c.   "personal and advertising injury";

d.   expenses for "bodily injury";

e.   damages

arising out of actions, allegations, expense initiated or caused to be brought about by any insured covered by this policy against any other insured covered by this policy.

All other terms and conditions of this policy remain unchanged.

CL 21 15 05 15     Includes copyrighted material of Insurance Services Office, Inc. with its       Page 1 of 1
permission. © 2015 Hamilton U.S. Holdings, Inc. All Rights Reserved.
May not be copied without permission.

GENERAL LIABILITY
CL 21 16 05 15

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# EARTH MOVEMENT EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to the policy:

This insurance does not apply to:

a.   "Bodily injury";

b.   "Property damage";

c.   "Personal and advertising injury";

d.   Expenses for "bodily injury";

e.   Defense costs;

f.   Fines; or

g.   Any other damages

caused by, resulting from, attributable or contributed to or aggravated by the subsidence of land as a result of landslide, mudflow, earth sinking or shifting, resulting from any operations of the Named Insured or on behalf of any Named Insured or any subcontractor of the Named Insured.

All other terms and conditions of this policy remain unchanged.

GENERAL LIABILITY
CL 21 20 05 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# INJURY TO INDEPENDENT CONTRACTORS AND SUBCONTRACTORS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to the policy:

This insurance does not apply to:

a.   "Bodily injury";

b.   "Property damage";

c.   "Personal and advertising injury";

d.   Expenses for "bodily injury";

e.   Defense costs; or

f.   Any other damages

to or sustained by any independent contractor, subcontractor, casual laborer or "volunteer worker", or to any "employee" or "temporary worker" of any independent contractor or subcontractor, while performing any work for you.

All other terms and conditions of this policy remain unchanged.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PROFESSIONAL MEDICAL SERVICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIANILITY COVERAGE FORM

A. The following exclusion is added to the policy:

Professional Medical Services

This insurance does not apply to any "bodily injury", "property damage" or "personal and advertising injury" or any other liability arising out of the rendering or failure to render "professional medical services".

B. For the purposes of this endorsement, the following definition is added to SECTION V — DEFINITIONS: "Professional Medical Services" means:

1. a. The following services:

   (1) Medical,

   (2) Surgical,

   (3) Dental,

   (4) Psychiatric,

   (5) Laboratory,

   (6) X-ray,

   (7) Nursing, or

   (8) Any advice, instruction, diagnosis or treatment or the furnishing of food or beverages in connection with the services listed in (1) through (7).

   b. Any health or therapeutic service, immunization, treatment, advice or instruction; or

   c. Any service, treatment, advice or instruction for the purpose of hair replacement.

2. The furnishing or dispensing of drugs, medical, dental or surgical supplies or appliances that require a prescription.

3. The handling or distribution of any blood product by an insured or the reliance upon any representation or warranty made at any time with respect to blood products.

4. Services in the practice of pharmacy.

5. The handling or treatment of:

   a. Organ donations;

   b. Corpses, including autopsies; and

   all other procedures related to corpses.

6. The service by any person as a member of a formal accreditation, standards review, peer review or equivalent professional board or committee or any medical or health care professional organization or committee.

All other terms and conditions of this policy remain unchanged.

            Includes copyrighted material of Insurance Services Office, Inc. with its permission. © 2016 Hamilton U.S. Holdings, Inc. All

COMMERCIAL GENERAL LIABILITY
CL 24 02 03 15

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# COMMUNICABLE DISEASE LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM

1. This insurance does not apply to:

   a. Claims;

   b. "Suits";

   c. "Bodily injury";

   d. "Property damage";

   e. "Personal and advertising injury";

   f. "Injury";

   g. Expenses for "bodily injury";

   h. Defense costs;

   i. Fines; or

   j. Any other damages

   arising out of the actual or alleged:

   (1) Transmission of a communicable disease by an insured, any employee of any insured or any subcontractor of an insured; or

   (2) Failure to perform services which were either intended to or assumed to prevent communicable diseases or their transmission to others.

2. However, we will pay up to a Limit of $5,000 for:

   a. Your expenses for your legal liability to provide immunizations in accordance with the Center of Disease Control (CDC) recommendations after an outbreak has occurred; and

   b. Your expenses incurred to properly sterilize your premises in accordance with the CDC's guidelines.

All other terms and conditions remain unchanged.

CL 24 02 03 15     Includes copyrighted material of Insurance Services Office, Inc. with its     Page 1 of 1
permission. © 2015 Hamilton U.S. Holdings, Inc. All Rights Reserved.
May not be copied without permission.

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

### COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

Copyright, Insurance Services Office, Inc., 2012
AmWINS Access

## 2. Exclusions

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

(a) The supervision, hiring, employment, training or monitoring of others by that insured; or

(b) Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

Copyright, Insurance Services Office, Inc., 2012
CG 00 01 04 13

f. **Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 Copyright, Insurance Services Office, Inc., 2012

(2) Any loss, cost or expense arising out of any:

    (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g.  **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

    (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

    (b) The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h.  **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i.  **War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

j.  **Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

Copyright, Insurance Services Office, Inc., 2012

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

l. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. Damage To Impaired Property Or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. Recall Of Products, Work Or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. Personal And Advertising Injury

"Bodily injury" arising out of "personal and advertising injury".

p. Electronic Data

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

q. Recording And Distribution Of Material Or Information In Violation Of Law

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording sending, transmitting, communicating or distribution of material or information.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III - Limits Of Insurance.

## COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

   This insurance does not apply to:

   a. **Knowing Violation Of Rights Of Another**

      "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

   b. **Material Published With Knowledge Of Falsity**

      "Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

   c. **Material Published Prior To Policy Period**

      "Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

   d. **Criminal Acts**

      "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

   e. **Contractual Liability**

      "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   f. **Breach Of Contract**

      "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

   g. **Quality Or Performance Of Goods - Failure To Conform To Statements**

      "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

   h. **Wrong Description Of Prices**

      "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i.** **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j.** **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k.** **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l.** **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m.** **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n.** **Pollution-related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o.** **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p.** **Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

(3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

(4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C - MEDICAL PAYMENTS

1. Insuring Agreement

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

         (a) The accident takes place in the "coverage territory" and during the policy period;

         (b) The expenses are incurred and reported to us within one year of the date of the accident; and

         (c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

      (1) First aid administered at the time of an accident;

      (2) Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

      (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions

   We will not pay expenses for "bodily injury":

   a. Any Insured

      To any insured, except "volunteer workers".

   b. Hired Person

      To a person hired to do work for or on behalf of any insured or a tenant of any insured.

   c. Injury On Normally Occupied Premises

      To a person injured on that part of premises you own or rent that the person normally occupies.

   d. Workers' Compensation And Similar Laws

      To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

   e. Athletics Activities

      To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

   f. Products-Completed Operations Hazard

      Included within the "products-completed operations hazard".

   g. Coverage A Exclusions

      Excluded under Coverage A.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

Copyright, Insurance Services Office, Inc., 2012

CG 00 01 04 13

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I - Coverage A - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

Copyright, Insurance Services Office, Inc., 2012

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insured for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by;

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

Copyright, Insurance Services Office, Inc., 2012

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal And Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I - Coverage A - Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

(2) When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. Premium Audit

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. Representations

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

   Copyright, Insurance Services Office, Inc., 2012

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph a. above;

(2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

     Copyright, Insurance Services Office, Inc., 2012     CG 00 01 04 13

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

 Copyright, Insurance Services Office, Inc., 2012 CG 00 01 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

CG 21 01 11 85

## EXCLUSION-ATHLETIC OR SPORTS PARTICIPANTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Description of Operations:**

CARPENTRY

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any operations shown in the Schedule, this insurance does not apply to "bodily injury" to any person while practicing for or participating in any sports or athletic contest or exhibition that you sponsor.

Copyright, Insurance Services Office, Inc., 1984

AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 21 07 05 14

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – LIMITED BODILY INJURY EXCEPTION NOT INCLUDED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Exclusion 2.p. of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:

2. Exclusions

This insurance does not apply to:

p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability

Damages arising out of:

(1) Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

(2) The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph (1) or (2) above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

B. The following is added to Paragraph 2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

2. Exclusions

This insurance does not apply to:

Access Or Disclosure Of Confidential Or Personal Information

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

© Insurance Services Office, Inc., 2013

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily Injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs (a), (b) or (c) above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs (a), (b) or (c) above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COMMERCIAL GENERAL LIABILITY
CG 21 52 04 13

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - FINANCIAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability and Paragraph 2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" resulting from the rendering of or the failure to render financial services by any insured to others. For the purpose of this exclusion, financial services include but are not limited to:

1. Planning, administering or advising on:
   a. Any:
      (1) Investment;
      (2) Pension;
      (3) Annuity;
      (4) Savings;
      (5) Checking; or
      (6) Individual retirement;
      plan, fund or account;
   b. The issuance or withdrawal of any bond, debenture, stock or other securities;
   c. The trading of securities, commodities or currencies; or
   d. Any acquisitions or mergers;

2. Acting as a dividend disbursing agent, exchange agent, redemption or subscription agent, warrant or scrip agent, fiscal or paying agent, tax withholding agent, escrow agent, clearing agent, or electronic funds transfer agent;

3. Lending, or arranging for the lending of, money, including credit card, debit card, leasing or mortgage operations or activities or interbank transfers;

4. Repossessing of real or personal property from a borrower or acting as an assignee for the benefit of creditors;

5. Checking or reporting of credit;

6. Maintaining of financial accounts or records;

7. Tax planning, tax advising or the preparation of tax returns; or

8. Selling or issuing traveler's checks, letters of credit, certified checks, bank checks or money orders.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or the failure to render financial services to others.

Copyright, Insurance Services Office, Inc., 2012
AmWINS Access

POLICY NUMBER:  AAHS1000014100

COMMERCIAL GENERAL LIABILITY
CG 21 54 01 96

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

Description and Location of Operation(s):

ALL OPERATIONS PERFORMED BY YOU FOR WHICH A WRAP-UP INSURANCE PROGRAM HAS BEEN PROVIDED.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph. 2., Exclusions of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I - Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at the location described in the Schedule of this endorsement, as a consolidated (wrap-up) insurance program has been provided by the prime contractor/ project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

(1) Provides coverage identical to that provided by this Coverage Part;

(2) Has limits adequate to cover all claims; or

(3) Remains in effect.

Copyright, Insurance Services Office, Inc., 1994
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph 2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability is replaced by the following:

This insurance does not apply to:

f.   Pollution

   (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

      This exclusion does not apply to:

      (a) "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

      (b) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

         (i)  At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

         (ii) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

   (2) Any loss, cost or expense arising out of any:

      (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

      (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Copyright, ISO Properties, Inc., 2003
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

2. Exclusions

This insurance does not apply to:

Fungi Or Bacteria

a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

B. The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

2. Exclusions

This insurance does not apply to:

Fungi Or Bacteria

a. "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

C. The following definition is added to the Definitions Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

Copyright, ISO Properties, Inc., 2003
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 21 73 01 15

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/ COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

A. The following exclusion is added:

This insurance does not apply to:

TERRORISM

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

B. The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

 Copyright, Insurance Services Office, Inc., 2014
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 21 86 12 04

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

1. The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

2. "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

B. The following definition is added to the Definitions Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

1. A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

2. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

3. A reinforced or unreinforced base coat;

4. A finish coat providing surface texture to which color may be added; and

5. Any flashing, caulking or sealant used with the system for any purpose.

Copyright, ISO Properties, Inc., 2003
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

2. **Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

a. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

b. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

c. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

B. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

2. **Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

a. "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

b. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

C. The following definitions are added to the Definitions Section:

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

 Copyright, ISO Properties, Inc., 2004
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 22 33 04 13

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - TESTING OR CONSULTING ERRORS AND OMISSIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability and Paragraph 2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. An error, omission, defect or deficiency in:

   a.  Any test performed; or

   b.  An evaluation, a consultation or advice given;

   by or on behalf of any insured;

2. The reporting of or reliance upon any such test, evaluation, consultation or advice; or

3. An error, omission, defect or deficiency in experimental data or the insured's interpretation of that data.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph 1., 2. or 3.

 Copyright, Insurance Services Office, Inc., 2012     Page 1 of 1
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 22 34 04 13

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - CONSTRUCTION MANAGEMENT ERRORS AND OMISSIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability and Paragraph 2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications by any architect, engineer or surveyor performing services on a project on which you serve as construction manager; or

2. Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved that which is described in Paragraph 1. or 2.

This exclusion does not apply to "bodily injury" or "property damage" due to construction or demolitionwork done by you, your "employees" or your subcontractors:

Copyright, Insurance Services Office, Inc., 2012
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 22 43 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability and Paragraph 2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

 Copyright, Insurance Services Office, Inc., 2012
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 22 79 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION- CONTRACTORS
# PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2. Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability and Paragraph 2. Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

1. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

   a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

   b. Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

   This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above.

2. Subject to Paragraph 3. below, professional services include:

   a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

   b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

Copyright, Insurance Services Office, Inc., 2012
AmWINS Access

COMMERCIAL GENERAL LIABILITY
CG 22 84 11 94

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MASSACHUSETTS CHANGES – SUPPLEMENTAL COVERAGE FOR LEAD POISONING ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Schedule

Limit of Liability
Each Occurrence $ 1,000,000

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A. With respect to the premises listed in the Declarations of this policy, for each "unit" on such premises for which you do not have either a "Letter of Interim Control" or a "Letter of Compliance", we will provide coverage under COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) for liability arising out of an "occurrence" of lead poisoning, as described below.

This insurance applies to "bodily injury" which occurs during the policy period and arises out of lead poisoning from lead in a covered "unit" for which one of the following applies:

1. A "Letter of Interim Control" or a "Letter of Compliance" is not in effect at the time the "bodily injury" occurs; or

2. The "bodily injury" occurs more than 14 days after you, or your managing agent, are notified by an authorized lead inspector that a "unit" on your premises is not in conformance with an already existing emergency lead management plan and the "Letter of Interim Control". Such coverage applies only when no extension to that 14 day period is in effect.

This insurance does not apply to "bodily injury" which is the result of your gross or willful negligence.

Subject to the General Aggregate Limit shown in the Declarations of this policy, the most we will pay for all "bodily injury" arising out of any one "occurrence" of lead poisoning is the Each Occurrence limit shown in the Schedule above.

B. For the purposes of this endorsement, the DEFINITIONS Section is amended by the addition of the following:

1. "Letter of Compliance" means a Letter of Lead Abatement Compliance or its equivalent issued by a licensed governmental or private lead inspector in accordance with applicable laws and Department of Public Health regulations on lead poisoning prevention and control. A "Letter of Interim Control" is not a "Letter of Compliance".

2. "Letter of Interim Control" means a letter, other than a "Letter of Compliance", which has been issued by a licensed lead inspector:

   a. In accordance with the applicable laws and the Department of Public Health regulations on lead prevention and control; and

   b. In connection with an emergency lead management plan which has been established to address an urgent lead paint hazard until a "Letter of Compliance" is obtained.

3. "Unit" means:

   a. A room or set of rooms, let to an individual or household for use as living and sleeping quarters, which:

      (1) Is located in any building, premises, dwelling, or in the residential portion of such building or premises which includes both residential and commercial accommodations; and

      (2) Was constructed prior to 1978; and

   b. The common areas used in connection with such room or set of rooms.

Copyright, Insurance Services Office, Inc., 1994

COMMERCIAL GENERAL LIABILITY
CG P 006 03 05

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# EXCLUSION — SILICA OR SILICA-RELATED DUST
# ADVISORY NOTICE TO POLICYHOLDERS

This Notice does NOT form a part of your insurance contract. The Notice is designed to alert you to coverage changes when the exclusion for silica or silica-related dust is attached to this policy. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply. Please read your policy, and the endorsements attached to your policy, carefully.

This Notice contains a brief synopsis of the following endorsements:

CG 21 96 03 05 – Silica Or Silica-Related Dust Exclusion (for use with Commercial General Liability Coverage Part)

CG 33 70 03 05 – Silica Or Silica-Related Dust Exclusion (for use with Owners And Contractors Protective Liability Coverage Part and Products/Completed Operations Coverage Part)

CG 33 71 03 05 – Silica Or Silica-Related Dust Exclusion (for use with Railroad Protective Liability Coverage Part)

When one of the above referenced endorsements is attached to your policy, coverage is excluded for bodily injury under Coverage A arising in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, silica or silica-related dust. In addition, coverage is excluded for property damage under Coverage A and personal and advertising injury under Coverage B arising in whole or in part; out of actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, silica or silica-related dust.

The attachment of any of these endorsements may result in a restriction of coverage.

# EXHIBIT B



**Engineering**



**Fire Investigations**



**Environmental Consulting**



**Specialty & Consulting**

Catastrophe Response

**Structural Engineering Report**



Insured: Ultimate Construction
Address of Loss:   301 Huron Avenue
                              Cambridge, MA 02138
Claim Number:      701360112896

Prepared For:

Hamilton Specialty Insurance Co.
C/o Cunningham Lindsey
P.O Box 703689
Dallas, TX 75370
ATTN: Mr. James Green

EFI Project No.: 98350-06929

May 14, 2018

Prepared By:

EFI Global, Inc.
155 West Street, Suite 6
Wilmington, Massachusetts 01887
Toll Free (800) 659-1202

Emergency 24 Hours:  888.888.2467
www.efiglobal.com



EFI Global

Engineering, Fire &
Environmental Services

155 West Street
Suite 6
Wilmington, MA 01887
T: 978-688-3736
TF: 800-650-1202
F: 978-688-5494
www.efiglobal.com



EFI Global

Engineering, Fire &
Environmental Services

May 14, 2018

Mr. James Green
Hamilton Specialty Insurance Company
C/o Cunningham Lindsey
P.O Box 703689
Dallas, TX 75370

RE:    Structural Engineering Report
       Insured: Ultimate Construction
       Loss Location: 301 Huron Avenue,
                      Cambridge, MA, 02138
       Date of Loss: January 19, 2018
       Claim Number: 701360112896
       EFI File No.: 98350-06929

Dear Mr. Green,

As requested, EFI Global, Inc. (EFI) has completed a forensic investigation of the property located
at 301 Huron Avenue, Cambridge, Massachusetts. Our findings, analysis, and conclusions are
included herein.

This report contains a discussion of the information gathered during the investigation, analysis
and conclusions with respect to the condition of the subject site at the time of EFI's inspection.
The conclusions contained herein are based on information available to date.

This written report is the response to your request for an engineering investigation at the property
and should be read in full.

## ASSIGNMENT

EFI received an assignment from James Green of Cunningham Lindsey to inspect the water
intrusion that occurred at the property located at 301 Huron Avenue, Cambridge, MA. The
reported date of loss (DOL) was January 19, 2018; however onsite, the representative for the
insured stated it occurred sometime between January 10, 2018 and January 14, 2018. In
response to this request, EFI contacted Ed Corea of Ultimate Construction to set an appointment
to investigate the loss. Gordon MacKenzie, PE examined the site on May 10, 2018. Ed Corea
was present during the inspection.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*

## BACKGROUND INFORMATION

The following information was gathered during the claim examination on May 10, 2018 through visual inspection and conversations with Ed Corea:

- Ultimate Construction was to do interior demolition (completely gut the interior), and remodel the structure.
- When the job was started, there was no sump pump present in the basement.
- A foundation perimeter drain was installed around the entire foundation, with the water discharging into a drywell that was to be constructed.
- The leaders to all gutters (except porch gutters) was directed to the same drywell that was to be constructed.
- As part of the job, a sump pump was to be installed, and discharged into the drywell to be constructed.
- At the time the job was started (approximately 1 year ago), the City of Cambridge would not allow connection to the city drainage system without prior approval.
- The neighbor's garage to the rear of the structure was previously flooded from roof drainage.
- The water intrusion on the date of the loss deposited approximately 8" of water on the basement floor.
- A second sump pump was installed after the loss.
- After the loss, the City of Cambridge inspected the dry well (after its contents were excavated), and granted Ultimate Construction permission to connect 100% of the roof drainage system to the city drainage system.
- The sump pump was connected and working at the time of the loss.
- The loss occurred between January 10, 2018 and January 14, 2018.
- The drywell that was constructed was 72" in diameter by 72" deep.
- The sump pump discharge pipe entered the drywell 30" below grade.
- Two 4" diameter pipes located 6" below grade were temporary pipes to carry roof drainage to the drywell, until the city connection to the drainage system could be made.

The following information was gathered after speaking with Ms. Kara Falise, of the City of Cambridge Building Department:

- The City of Cambridge does not allow connection to the city drainage system without prior approval. ·
- Installation of a dry well to collect roof drainage is not a requirement.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*

- The only requirement for roof drainage is that it cannot be discharged over city walkways.
- After the loss, the City granted permission to connect 100% of the roof drainage to the city drainage system.

## PROTOCOL FOR SITE INVESTIGATION

This report is based on a visual inspection of the damages at the above referenced structure. No destructive investigation was performed. The construction drawings were not reviewed prior to writing this report. The observations and recommendations are based only on the visible portions of the structure at the time of the investigation.

## BUILDING/SYSTEM DESCRIPTION

The home is a three story wood structure built in 1909. The structure is being converted to three condominium units of varying sizes. The house rests on a stone foundation, and is situated on a relatively small lot (estimated to be 1/4 acre or less).

## OBSERVATIONS

The following observations were noted during the claim examination on May 10, 2018:

- At the time of the inspection, the basement was dry, and water proofing was installed along the perimeter of the foundation (post loss).
- Approximately 24" of drywall was removed at the bottoms of all basement interior walls.
- Two new sump pumps were installed. The second sump pump was installed after the loss.
- A 4' diameter by 4' deep drywell was excavated, and located approximately 30' from the rear corner of the foundation. Two 4" diameter pipes entered the drywell, approximately 6" below grade.
- The earth forming the walls of the drywell was clayey/silty soil.
- Temporary piping was installed to carry the roof drainage to the drywell at the rear of the property.
- The land in the rear of the property slopes gently down, and away from the structure.
- The neighbor's stone garage abuts the rear property line. The slab elevation of this garage is at a significantly lower elevation than the rear yard to the subject property.
- The sump pump that was installed at the time of the loss was approximately 60' from the drywell.
- It was unclear what the drywell was filled with, as the spoils appeared to be rocky fill with clayey/silty filler material.
- The sump pump was not removed during the inspection; nor was its operation checked.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*

- The sump pump had a backup battery system which would operate the sump pump in the event of a power failure.

## DISCUSSION

Although the City did not require a drywell to accept roof drainage, the contractor was told that the abutting property to the rear of the subject property was previously flooded by groundwater. As the rear yard to the subject property gently slopes toward the abutting neighbor's property, and the abutting neighbor's property is at a lower elevation, this could be expected. To remedy this condition, Ultimate Construction determined that a drywell would solve the problem. Unfortunately, Ultimate Construction did not engage the services of an engineer to design the drywell, nor did they engage the services of a testing company to conduct a percolation test of the soil in the vicinity of the drywell.

The soil in which the drywell was constructed was clayey/silty soil, which historically does not drain well, and has a poor perc rate, which could be as high as 60 minutes per inch. What this means is that the soil drains extremely slowly, and is not acceptable for use in a drywell. When the city inspector saw the type of soil in which the drywell was constructed, she authorized Ultimate Construction to connect to the city drainage system.

On January 13, 2018, approximately 1.25" of rain fell. The drywell was incapable of handling the entire roof drainage area (approximately 1,500 SF of roof area), any groundwater beneath the basement floor, as well as the water from the foundation perimeter drain. Consequently, the drywell filled with water. Ordinarily, this would not be a serious problem (for the structure under investigation), as the drywell would fill, and water would then flow toward the rear of the property, and cause problems for the abutting neighbors, which could lead to additional claims. What created the problem for this structure was the fact that the sump pump was connected to this drywell, which provided an avenue for water intrusion, through the discharge pipe. The elevation of the top of the drywell is well above the basement sump pump, and the basement sump pump likely could not develop the required head to overcome this elevation change, as well as the pipe friction loss due to elbows, and 60 lineal feet of pipe. Thus the water flowed through the sump pump pipe, and into the basement. The specifications of the sump pump were not available, and therefore not reviewed, however, overcoming approximately 60 lineal feet of discharge pipe, elevation changes, and bends and turns in the pipe would require a relatively powerful pump.

It is unlikely the water intrusion between January 10, 2018 and January 14, 2018 was from a high ground water table, since the basement had no sump pump prior to the renovations. Had groundwater table been an ongoing problem with this structure, a sump pump would most likely have been present or evidence of past, regular water intrusion into the basement would have been observed or reported. In addition, the groundwater table is typically lower during the winter months (when this loss occurred), and rises in the spring.

*Insured: Ultimate Construction*
*Claim No: 701350112896*
*EFI No: 98350-06929*
*May 14, 2018*

## RESULTS OF THE INVESTIGATION (CONCLUSIONS)

Based on the work of EFI, the following has been determined:

- It is EFI's opinion that the water intrusion was caused by an inadequately designed and constructed drywell, which allowed water to flow from the drywell through the sump pump discharge pipe, and into the basement.

## QUALIFICATIONS

The information presented in this report addressed the limited objectives related to the evaluation of the loss at 301 Huron Ave, Cambridge, Massachusetts. This report only describes the conditions present at the time of our evaluation. It is not intended to fully delineate or document every defect or deficiency throughout the subject property. If any additional information is encountered which relates to this evaluation, EFI reserves the right to alter the opinions contained in this report. In some cases, additional studies may be warranted to fully evaluate concerns noted.

The findings noted herein do not constitute a scope of work for repair or offer of repair. Detailed design documents should be prepared to accurately reflect the scope of any repair work and competitive bids obtained to determine actual repair costs.

Our services have been performed using that degree of skill and care ordinarily exercised under similar conditions by reputable members of EFI's profession practicing in the same or similar locality at the time of performance.

Any oral statements made before, during, or after the course of the investigation were made as a courtesy only and are not considered a part of this report.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-05929*
*May 14, 2018*

## CLOSING

EFI appreciates this opportunity to provide consulting services for Hamilton Specialty Insurance Company and Cunningham Lindsey in this matter. Please contact us should any questions arise concerning this report, or if we may be of further assistance.

Respectfully submitted,
EFI Global, Inc.:

Gordon J. MacKenzie, MS, P.E, CSP
Professional Engineer
MA PE License No: 31218

Peer Review

Sarah Byer
Structural Engineer

Attachments:  Photograph Log

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-05929*
*May 14, 2018*

## PHOTOGRAPHS



Photo 1) This photograph shows an aerial view of property.



Photo 2) This photograph shows the front elevation of the property.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*



Photo 3) This photograph shows the right elevation of the property (when viewed from the street).



Photo 4) This photograph shows the right elevation of the property (when viewed from the street).

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*



Photo 5) This photograph shows the left elevation of the property (when viewed from the street).



Photo 6) This photograph shows the rear elevation of the property.

Insured: Ultimate Construction
Claim No: 701360112896
EFI No: 98350-06929
May 14, 2018



Photo 7) This photograph shows the rear elevation of the property.



Photo 8) This photograph shows interior basement walls.

*Insured: Ultimate Construction*
*Claim No: 701360112695*
*EFI No: 98350-06929*
*May 14, 2018*



Photo 9) This photograph shows interior basement walls.



Photo 10) This photograph shows interior basement walls

Insured: Ultimate Construction
Claim No: 701350112896
EFI No: 98350-06929
May 14, 2018



Photo 11) This photograph shows the stone foundation walls.



Uninterruptible power supply for sump pump

Photo 12) This photograph shows the second sump pump added after the loss.

Insured: Ultimate Construction
Claim No: 701J60112696
EFI No: 98350-06929
May 14, 2018



Photo 13) This photograph shows the uninterruptible power supply for the sump pump installed at the time of the loss.



Photo 14) This photograph shows the basement waterproofing installed after the loss.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*



Photo 15) This photograph shows the sump pump installed at the time of the loss.



Photo 16) This photograph shows temporary piping to carry roof runoff to the drywell, until the city connection is made.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*



Photo 17) This photograph shows temporary piping from roof leaders.



Photo 18) This photograph shows the excavated drywell, as well as the neighbor's garage that was flooded in the past (arrows).

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*



Photo 19) This photograph shows a closer view of the drywell.



Photo 20) This photograph shows a view of the soil conditions in the drywell.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*



Photo 21) This photograph shows what was presumably in the drywell.



Photo 22) This photograph shows clayey/silty soil in the walls of the drywell.

# EXHIBIT C

REPORT ON EXAMINATION

OF

HAMILTON SPECIALTY INSURANCE COMPANY

AS OF

DECEMBER 31, 2016

Trinidad Navarro
Commissioner



Delaware Department of Insurance

I, Trinidad Navarro, Insurance Commissioner of the State of Delaware, do hereby certify that the attached REPORT ON EXAMINATION, made as of December 31, 2016 of the

## HAMILTON SPECIALTY INSURANCE COMPANY

is a true and correct copy of the document filed with this Department.

Attest By: _Rubugon Burm_

Date: May 31, 2018

In Witness Whereof, I have hereunto set my hand and affixed the official seal of this Department at the City of Dover, this _13th_ day of _June_, 2018.

_Z-d-d Navarro_

Trinidad Navarro
Insurance Commissioner

Trinidad Navarro
Commissioner



Delaware Department of Insurance

# REPORT ON EXAMINATION

## OF THE

## HAMILTON SPECIALTY INSURANCE COMPANY

## AS OF

## DECEMBER 31, 2016

The above-captioned report was completed by examiners of the Delaware Department of Insurance.

Consideration has been duly given to the comments, conclusions and recommendations of the examiners regarding the status of the company as reflected in the report.

This report is hereby accepted, adopted and filed as an official record of this Department.

Trinidad Navarro
Insurance Commissioner

Dated this _13_ day of _June_, 2018

## TABLE OF CONTENTS

SALUTATION ........................................................................................................................ 1

SCOPE OF EXAMINATION ............................................................................................. 1

SUMMARY OF SIGNIFICANT FINDINGS ................................................................. 3

COMPANY HISTORY ........................................................................................................ 3

MANAGEMENT AND CONTROL .................................................................................. 5

    Directors ............................................................................................................................. 5

    Officers .............................................................................................................................. 5

    Insurance Holding Company System ........................................................................... 7

TERRITORY AND PLAN OF OPERATION ............................................................. 10

REINSURANCE .................................................................................................................. 11

    Analysis of Assets ......................................................................................................... 15

    Statement of Liabilities, Surplus and Other Funds ................................................ 16

    Underwriting and Investment Exhibit – Statement of Income ............................ 17

    Reconciliation of Surplus Since last Exam .............................................................. 18

SCHEDULE OF EXAMINATION ADJUSTMENTS ................................................ 18

NOTES TO FINANCIAL STATEMENTS .................................................................... 18

ANALYSIS OF CHANGES IN THE FINANCIAL STATEMENTS RESULTING FROM

EXAMINATION ................................................................................................................. 21

SUBSEQUENT EVENTS .................................................................................................. 21

COMPLIANCE WITH PRIOR EXAMINATION RECOMMENDATIONS ............. 23

SUMMARY OF RECOMMENDATIONS ..................................................................... 23

CONCLUSION .................................................................................................................... 23

## SALUTATION

March 22, 2018

Honorable Trinidad Navarro
Delaware Insurance Commissioner
Delaware Department of Insurance
Rodney Building
841 Silver Lake Blvd.
Dover, Delaware 19904

Dear Commissioner;

In compliance with instructions and pursuant to statutory provisions contained in Exam Authority No. 17.017, dated April 25, 2017, an examination has been made of the affairs, financial condition and management of

### HAMILTON SPECIALTY INSURANCE COMPANY

with statutory home office located at 1209 Orange Street, Wilmington, Delaware 19801 and its administrative home office located at 600 College Road East, Suite 3500, Princeton, New Jersey, 08540. The report of examination thereon is respectfully submitted.

## SCOPE OF EXAMINATION

The Delaware Department of Insurance (Department) performed a risk-focused financial examination of Hamilton Specialty Insurance Company (HSIC). The last examination covered the period of July 15, 2008 through December 31, 2011. This examination covers the period of January 1, 2012 through December 31, 2016, and encompassed a general review of transactions during the period, the Company's business policies and practices, as well as management and relevant corporate matters, with a determination of the financial condition of the Company as of

Hamilton Specialty Insurance Company

December 31, 2016. Transactions after the examination date were reviewed where deemed necessary.

The examination was conducted concurrently with that of its Delaware-domiciled subsidiary, Hamilton Insurance Company (HIC).

We conducted the examination in accordance with the *National Association of Insurance Commissioners* (NAIC) *Financial Condition Examiners Handbook* (Handbook) and generally accepted statutory insurance examination standards consistent with the Insurance Code and Regulations of the State of Delaware. The NAIC Handbook requires that the Department plan and perform the examination to evaluate the financial condition, assess corporate governance, identify current and prospective risks of the Company and evaluate system controls and procedures used to mitigate those risks. An examination also includes identifying and evaluating significant risks that could cause an insurer's surplus to be materially misstated both currently and prospectively. All accounts and activities of the Company were considered in accordance with the risk-focused examination process. This may include assessing significant estimates made by management and evaluating management's compliance with Statutory Accounting Principles (SSAP). The examination does not attest to the fair presentation of the financial statements included herein. If, during the course of the examination an adjustment is identified, the impact of such adjustment will be documented separately following the Company's financial statements.

This examination report includes significant findings of fact, pursuant to the General Corporation Law of the State of Delaware as required by 18 *Del. C.* § 321, along with general information about the insurer and its financial condition. There may be other items identified

2

Hamilton Specialty Insurance Company

during the examination that, due to their nature, are not included within the examination report but separately communicated to other regulators and/or the Company.

During the course of this examination, consideration was given to work performed by the Company's external auditing firm, Ernst & Young LLP (E&Y), New York, NY. Certain auditor work papers have been incorporated into the work papers of the examination.

## SUMMARY OF SIGNIFICANT FINDINGS

This examination had no material adverse findings, significant non-compliance findings, material changes in financial statements, or updates on other significant regulatory information disclosed in the previous examination.

## COMPANY HISTORY

General

The Company was incorporated as Valiant Specialty Insurance Company (VSIC) under the laws of the State of Delaware on July 15, 2008, as a subsidiary of Valiant Insurance Company (VIC), a Delaware domestic insurer. At that time, VIC was a wholly-owned subsidiary of Valiant Insurance Group (VIG), whose ultimate parent was Ariel Holdings, Ltd. (Ariel).

On November 5, 2010, First Mercury Financial Corporation's (FMFC) principal insurance subsidiary, First Mercury Insurance Company (FMIC), purchased VIG from Ariel. On February 9, 2011, FMFC merged with a wholly-owned indirect subsidiary of Fairfax Financial Holdings Limited (Fairfax), a Canadian financial services holding company with shares listed and publicly-traded on the Toronto Stock Exchange. Fairfax then became the Company's ultimate parent and the immediate parent of VIC was TIG Insurance Company (TIG), a California-domiciled property and casualty insurer within the Fairfax Group.

3

Hamilton Specialty Insurance Company

On October 6, 2014, VIC and the Company, its subsidiary, were purchased by Hamilton Insurance Group, Ltd. (HIG) and Hamilton U.S. Holdings, Inc. (Hamilton US), a Delaware-domiciled holding company, became the immediate parent of HIC, which became the immediate parent of HSIC. The Company's name was changed to HSIC. Through a quasi-reorganization in 2015 approved by the Department, ownership of HIC was transferred to HSIC.

Capitalization

The Company is authorized to issue 4,200,000 shares of common capital stock with a par value of $1 per share. As of December 31, 2016, 4,200,000 common stock shares are issued, outstanding and owned by Hamilton US.

The following table reflects the Company's capitalization activity since the prior examination:

|  | Common Stock | Gross Paid-in & Contributed Surplus |
| --- | --- | --- |
| December 31, 2011 | $4,200,000 | $16,800,000 |
| Distributions During the Exam Period |  | (16,000,000) |
| Contributions During the Exam Period |  | 83,692,871 |
| December 31, 2016 | $4,200,000 | $84,492,871 |

The following contributions were received by the Company during the exam period:

| | |
| --- | --- |
| 2014 | $44,842,871 |
| 2015 | 19,100,000 |
| 2016 | 19,750,000 |
| Total | $83,692,871 |

Dividends and Distributions

According to Company records for the years indicated, as reflected in the Board of Directors (Board) meeting minutes, dividends and distributions were paid to the sole stockholder and approved by the Department as follows:

4

Hamilton Specialty Insurance Company

| Approved | Paid | Paid Amount | Type | Form |
|---|---|---|---|---|
| June 7, 2012 | July 30, 2013 | $16,000,000 | (1) Extraordinary Distribution | Cash |
| July 26, 2014 | October 5, 2014 | $267,406 | (2) Extraordinary Dividend | Cash |

(1) Distributed as a return of capital (an extraordinary distribution accounted for as a reduction to gross paid in and contributed surplus).

(2) Relates to the transfer of ownership of the Company on October 6, 2014, as part of the sale of the Company from VIG to Hamilton US.

## MANAGEMENT AND CONTROL

Pursuant to the General Corporation Law of the State of Delaware, as implemented by the Company's Certificate of Incorporation and bylaws, all corporate powers and its business property and affairs are managed by, or under the direction of, its Board. The Board shall consist of at least four members and subject to a maximum of eighteen members.

The Board as of December 31, 2016, was comprised of four members, each elected or appointed in accordance with Company bylaws. Each Director shall hold office until his successor is elected and qualified, or until earlier resignation or removal.

Directors

The Board, duly elected in accordance with the Company's bylaws and serving as of December 31, 2016, were as follows:

| Director Name | Principal Business Affiliation |
|---|---|
| Seraina Macia | President & CEO |
| Michael Joseph Garceau | Chief Operating Officer |
| Patricia Marie Haemmerle Aprill | Senior Vice President – Finance & Treasurer |
| Keith James Wagner | Senior Vice President, General Counsel & Secretary |

Committees

There were no standing Board committees as of December 31, 2016.

Officers

The bylaws of the Company state that the principal officers shall be a Chairman of the Board, a Vice Chairman of the Board, a Chief Executive Officer, a President, one or more Vice-

Hamilton Specialty Insurance Company

Presidents, a Secretary, a Treasurer, one or more Assistant Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers and such other officers as the Board from time to time may determine.

As of December 31, 2016, the Company's principal officers and their respective titles were as follows:

| Officer Name | Title |
|---|---|
| Seraina Macia | President & CEO |
| Michael Joseph Garceau | Chief Operating Officer |
| Patricia Marie Haemmerle Aprill | Senior Vice President – Finance & Treasurer |
| Keith James Wagner | Senior Vice President, General Counsel & Secretary |
| Diana Lyn Branciforte | Vice President – Finance & Controller |
| Brian Gorgas | Vice President, Chief Technology Officer & Chief Privacy and Security Officer |
| John Thomas Rooney | Vice President-Legal Services & Assistant Secretary |

The minutes of the meetings of the Stockholder and Board held during the period of examination, were read and noted. Attendance at meetings, election of directors and officers and approval of investment transactions were also noted.

Inspection of Company files indicated that an ethics statement/conflict of interest statement was completed by all employees for the examination period. A review of the Company's bylaws revealed that no changes were made during the examination period.

A review was performed for compliance with 18 *Del. C.* § 4919. Based on our review, the Company is in compliance.

Corporate Records

The recorded minutes of the Board were reviewed for the period under examination. The recorded minutes of the Board adequately documented its meetings and approval of Company transactions and events, for the approval of investment transactions in accordance with 18 *Del. C.* § 1304.

Hamilton Specialty Insurance Company

<u>Insurance Holding Company System</u>

The Company is a member of an Insurance Holding Company System as defined under 18 *Del. C.* § 5001 of the Delaware Insurance Code. As previously noted, the immediate parent of the Company as of December 31, 2016, was Hamilton US and the ultimate parent is HIG.

The organizational chart of HIG as of December 31, 2016, with domicile in parentheses along with the control percentages of the upstream affiliates' control of the downstream affiliate is presented below:

| | Economic Control | Voting Control |
|---|---|---|
| Sango Hoken Holdings, LLC {1} | 24.3% | 9.5% |
| Hopkins Holdings, LLC {1} | 24.3% | 9.5% |
| BSOF Master Fund, LP {1} | 13.7% | 9.5% |
| All Others | 37.7% | 71.5% |
| Hamilton Insurance Group, Ltd. (Bermuda) | 100.0% | 100.0% |
|   Hamilton Re, Ltd. (Bermuda) | 100.0% | 100.0% |
|     Hamilton U.S. Holdings, Inc. (Delaware) | 100.0% | 100.0% |
|       Hamilton Specialty Insurance Company (Delaware) | 100.0% | 100.0% |
|       Hamilton Insurance Company (Delaware) | | |
|     Hamilton U.S. Holdings, Inc. (Delaware) | 100.0% | 100.0% |
|       Hamilton Services, LLC (Delaware) | | |
|     Hamilton U.S. Holdings, Inc. (Delaware | 100.0% | 100.0% |
|       Hamilton Customer Care Insurance Services, LLC (Delaware) | | |
|     Hamilton U.S. Holdings, Inc. (Delaware) | 33.3% | 33.3% |
|       Attune Holdings, LLC (Delaware) | 100.0% | 100.0% |
|         Attune Insurance Services, LLC (Delaware) | | |

{1} HSIC filed a disclaimer of affiliation with the Department on this entity's behalf at the October 6, 2014, acquisition by Hamilton US from VIG, which was approved on January 28, 2015.

The Company filed the required Annual Form B and Form C filings for all of the years under examination, which were reviewed for compliance with the Delaware Insurance code.

<u>Affiliated Agreements</u>

*Tax Allocation Agreement*

Effective October 6, 2014, the Company entered into a tax allocation agreement among Hamilton US, Hamilton Services, LLC (Hamilton Services), HIC and Hamilton Custom Care

Hamilton Specialty Insurance Company

Insurance Services, LLC (added by amendment effective April 4, 2016), for tax years ending December 31, 2014, and later. Under this agreement, income tax expenses are computed on a separate company basis as if each affiliate filed a separate tax return. Intercompany balances are settled on a quarterly basis. The tax allocation agreement was approved by the Department on September 8, 2014.

*Administrative Services Agreements*

Effective October 6, 2014, the Company entered into an administrative services agreement among Hamilton US, Hamilton Services and HIC. Hamilton Services as administrator will provide the following services on behalf of its affiliates: underwriting, policy administration, systems and information technology, marketing and corporate affairs, filing of rates and forms, reserving, reinsurance, investment management, tax compliance, treasury, budget and cost accounting, legal, office space, accounting and actuarial, human resources and personnel. Invoicing and settlement of balances occurs quarterly. The administrative services agreement was approved by the Department on September 8, 2014. This administrative services agreement was terminated and replaced with the amended and restated administrative services agreement described in the following paragraph.

Effective October 4, 2015, the Company entered into an amended and restated administrative services agreement among Hamilton US, Hamilton Services and HIC, similar to and replacing the administrative services agreement described in the preceding paragraph. The amended and restated administrative services agreement was approved by the Department on September 14, 2015.

8

Hamilton Specialty Insurance Company

*Capital Maintenance Agreements*

Effective October 6, 2014, the Company and HIC entered into a capital maintenance agreement with HIG whereby HIG would guarantee to maintain the combined policyholder surplus of HSIC and HIC above $45 million. Any party may terminate the agreement with written notice. This agreement was approved by the Department on September 28, 2014. This capital maintenance agreement was terminated and replaced with the amended and restated capital maintenance agreement described in the following paragraph.

Effective October 6, 2014, the Company and HIC entered into an amended and restated capital maintenance agreement with HIG whereby HIG would guarantee to maintain the combined policyholder surplus of HSIC and HIC above $50 million. Any party may terminate the agreement with at least twelve months written notice. This agreement was approved by the Department on January 29, 2015.

<u>Unaffiliated Agreements</u>

*Custodial Agreement*

Effective March 29, 2011, the Company entered into a custodial agreement with The Bank of New York Mellon (BNY-Mellon), which provides for the safekeeping of the Company's invested assets. The most recent SSAE16 Report for BNY-Mellon was obtained and reviewed without exception.

The custodial agreement contains all of the required protective language specified in the NAIC Handbook with the exception of Paragraph "L" which requires the custodial agreement to state: "The foreign bank acting as a custodian, or a U.S. custodian's foreign agent, or a foreign clearing corporation is only holding foreign securities or securities required by the foreign

9

Hamilton Specialty Insurance Company

country in order for the insurer to do business in that country.  A U.S. custodian must hold all other securities."

*It is recommended that the Company amend its custodial agreement to comply with NAIC Handbook guidelines.*

## TERRITORY AND PLAN OF OPERATION

### Territory

The Company is currently licensed in Delaware as a domestic surplus lines insurer and is exempt in the remaining forty-nine U.S. states and the District of Columbia.

### Plan of Operation

The Company has two tracks for its strategy.  The first track consists of a binding authority relationship for HSIC's non-admitted Commercial Property and General Liability small business products written through certain producers and brokers of AmWINS Group, Inc. (AmWINS).  These products have been in the market for approximately two years and HSIC has continued to enhance pricing and coverage to improve these offerings.  During the 2016 calendar year, these products generated approximately $26 million in gross written premium.  However, since management determined that the AmWINS facility is no longer strategic, HSIC issued a cancellation notice, effective September 9, 2017, of its contractual and trading relationship with AmWINS.  In light of the cancellation, AmWINS premium volume for the balance of 2017 is expected to reach $30 million, and there will be no further AmWINS premium reflected in the Company's financial statements for 2018 and subsequent calendar years.

HSIC's second track is a planned strategy to enter the middle market insurance space.  During the first quarter of 2017, HSIC has worked to develop that middle market strategy.  The focus of the 2017 calendar year is expected to center mainly on exploration and market testing, on a limited basis, with one or two distribution partners.  In addition, HSIC will begin building

10

Hamilton Specialty Insurance Company

out products, including a commercial package property and liability product and beta testing HSIC's technology solutions. HSIC's current projection is to achieve potentially up to $150 million in gross written premium by the end of 2021. HSIC will also develop certain non-admitted Professional Liability product offerings.

As respects HSIC's current Programs business, after a strategic assessment, HSIC has decided largely to exit its Programs partnerships. While those relationships have proved beneficial over the last two years, HSIC wants to ensure that its focus is exclusively on creating a differentiated offering in the market that leverages data, analytics and technology. HSIC's Programs business represented approximately $68 million in gross written premium during 2016. This volume will decline as these relationships are terminated. All but one program are expected to terminate by the end of 2017 with the remaining program expected to terminate by the end of 2018.

A.M. Best Rating

Based on A.M. Best's current opinion of the consolidated financial condition and operating performance, the Company was assigned an A.M. Best rating of A- (Excellent) for the year ended 2016. A.M. Best notes that the rating reflects the Company's start-up nature and its risk adjusted capitalization.

## REINSURANCE

The Company reported the following distribution of premiums written in 2016:

| | |
|---|---|
| Direct | $92,473,611 |
| Reinsurance assumed from affiliates | 0 |
| Reinsurance assumed from non-affiliates | 0 |
| Total gross (direct and assumed) | $92,473,611 |
| | |
| Reinsurance ceded to affiliates | $55,886,448 |
| Reinsurance ceded to non-affiliates | 18,139,760 |
| Total ceded | $74,026,208 |
| | |
| Net premiums written | $18,447,403 |

11

Hamilton Specialty Insurance Company

The Company retained 19.9% of its gross business in 2016.

## Assumed

The Company does not assume any business.

## Ceded to Affiliates

The Company ceded $55,886,448 of its gross written premiums to affiliate Hamilton Re, Ltd. (Hamilton Re) in 2016 under the amended and restated 75% quota share reinsurance agreement and the amended and restated stop loss reinsurance agreement for 90% of the Company's net retained liability. The cessions under these two affiliated reinsurance agreements represent 75.5% of the $74,026,208 total written premiums ceded for 2016, which demonstrates the extent of the Company's reliance on its affiliate Hamilton Re for reinsurance support.

## Ceded to Non-affiliates

*Cession to TIG*

Effective January 1, 2015, HSIC and HIC entered into a 100% quota share agreement with TIG, whereby TIG assumes any and all insurance and reinsurance assets and liabilities of HSIC and HIC incurred prior and up to October 6, 2014. While HSIC and HIC share certain rights to third party reinsurance agreements assigned to TIG, Schedule F of the Annual Statement reflects only the cession to TIG. This agreement was approved by the Department. During 2016, no premiums were ceded under this agreement.

As of December 31, 2016, the Company reported the following ceded loss and loss adjustment expense (LAE) reserves to TIG:

| | |
|---|---|
| Case Loss and LAE Reserves | $  676,000 |
| Incurred But Not Reported Loss and LAE Reserves | 4,370,000 |
| Total Loss and LAE cessions to TIG | $5,046,000 |

12

Hamilton Specialty Insurance Company

*Cessions to Others*

As noted above, the Company ceded $18,139,760 in written premiums to non-affiliated reinsurers in 2016, which represents 19.6% of the $92,473,611 total written premiums ceded for 2016.

HSIC and HIC entered into the following external covers, which constituted the majority of the unaffiliated cessions in 2016:

| Description | Effective | Ending | Limits | HSIC 2016 Written Premiums Ceded | HIC 2016 Written Premiums Ceded |
|---|---|---|---|---|---|
| Alta Excess and Umbrella 100% quota share 90% placement | 3/1/2016 | 3/1/2017 | $9 million per claim or policy | $5,623,454 | $199,800 |
| Property Catastrophe Excess of Loss | 6/1/2016 | 6/1/2017 | $145m excess $15m each loss in 3 layers: $35m excess $15m $30m excess $50m $80m excess $80m $290m all losses | 5,100,726 | 693,134 |
| Alta Environmental Liability 100% quota share 30% placement | 1/1/2016 | 1/1/2017 | $11 million per claim or policy | 3,304,780 | 152,720 |
| Total these three contracts | | | | $14,028,960 | $1,045,654 |
| Total all unaffiliated cessions | | | | $18,139,760 | $1,655,832 |
| Total % of these three contracts | | | | 77.34% | 63.15% |

Hamilton Specialty Insurance Company

Written premiums ceded to external reinsurers is broken down as follows:

| Reinsurer | Premium | Percent |
|---|---|---|
| Munich Reinsurance America, Inc. (Delaware) | $9,158,000 | 50.5% |
| Arch Reinsurance Company (Delaware) | 1,446,000 | 8.0% |
| Everest Reinsurance Company (Delaware) | 1,315,000 | 7.2% |
| All Others (9 reinsurers) | 2,643,000 | 14.6% |
| Authorized Domestic (12 reinsurers) | $14,562,000 | 80.3% |
| Authorized Foreign (16 reinsurers) | 1,684,000 | 9.3% |
| Unauthorized Foreign (6 reinsurers) | 1,765,000 | 9.7% |
| Certified Foreign (1 reinsurer) | 129,000 | 0.7% |
| Total | $18,140,000 | 100.0% |

## FINANCIAL STATEMENTS

The following pages contain the Company's Financial Statements for the year ended December 31, 2016, as determined by this examination, with supporting exhibits as detailed below:

Analysis of Assets
Statement of Liabilities, Surplus and Other Funds
Underwriting and Investment Exhibit – Statement of Income
Reconciliation of Surplus since last Examination
Schedule of Examination Adjustments

14

Hamilton Specialty Insurance Company

Analysis of Assets
As of December 31, 2016

|  | Assets | Nonadmitted Assets | Net Admitted Assets | Note |
|---|---|---|---|---|
| Bonds | $50,843,189 | | $50,843,189 | 1 |
| Common Stocks | 21,658,006 | | 21,658,006 | 2 |
| Cash, cash equivalents and short-term investments | 13,749,979 | | 13,749,979 | |
| Other invested assets | 8,177,433 | | 8,177,433 | 3 |
| Investment income due and accrued | 193,445 | | 193,445 | |
| Uncollected premiums and agents' balances in the course of collection | 7,310,843 | 203,638 | 7,107,205 | |
| Aggregate write-ins for other than invested assets | 1,762,138 | 1,762,138 | 0 | |
| Total Assets | $103,695,033 | $1,965,776 | $101,729,257 | |

15

Hamilton Specialty Insurance Company

## Statement of Liabilities, Surplus and Other Funds
### As of December 31, 2016

|  |  |  | Note |
|---|---|---|---|
| Losses | $ | 6,568,840 | 4 |
| Loss adjustment expenses |  | 2,112,883 | 4 |
| Commissions payable, contingent commissions & other similar |  | 3,479,715 |  |
| Other expenses |  | 5,546,755 |  |
| Taxes, licenses and fees |  | 555,302 |  |
| Unearned premium reserve |  | 9,483,705 |  |
| Ceded reinsurance premiums payable |  | 22,639,414 |  |
| Payable to parent, subsidiaries and affiliates |  | 1,144,584 |  |
| Total Liabilities | $ | 51,531,198 |  |
|  |  |  |  |
| Common capital stock | $ | 4,200,000 |  |
| Gross paid in and contributed surplus |  | 84,492,871 |  |
| Unassigned funds (surplus) |  | (38,494,812) |  |
| Surplus as regards policyholders | $ | 50,198,059 |  |
|  |  |  |  |
| Total Liabilities, Capital and Surplus | $ | 101,729,257 |  |

16

Hamilton Specialty Insurance Company

## Underwriting and Investment Exhibit – Statement of Income
### For the Year Ended December 31, 2016

**UNDERWRITING INCOME**

| | | |
|---|---|---:|
| Premiums earned | $ | 11,879,182 |

**DEDUCTIONS**

| | | |
|---|---|---:|
| Losses incurred | $ | 7,587,548 |
| Loss adjustment expenses incurred | | 2,984,012 |
| Other underwriting expenses incurred | | 23,852,545 |
| Aggregate write-ins for underwritting deductions | | - |
| Total underwriting deductions | $ | 34,424,105 |
| Net underwriting gain or (loss) | $ | (22,544,923) |

**INVESTMENT INCOME**

| | | |
|---|---|---:|
| Net investment income earned | $ | 476,270 |
| Net realized capital gains or (losses) less capital gains tax of $0 | | 2,840 |
| Net investment gain or (loss) | $ | 479,110 |

### Other Income

| | | |
|---|---|---:|
| Net gain (loss) from agents' or premium balances charged off (amount recovered $0 amount charged off $0 | $ | - |
| Aggregate write-ins for miscellaneous income | | - |
| Total other income | $ | - |
| Net income before dividends to policyholders; after capital gains tax and before all other federal and foreign income taxes | $ | (22,065,813) |
| Net income; after dividends to policyholders; after capital gains tax and before all other federal and foreign income taxes | | (22,065,813) |
| Federal and foreign income taxes incurred | | - |
| Net Income | $ | (22,065,813) |

17

Hamilton Specialty Insurance Company

## Reconciliation of Surplus Since last Exam
### As of December 31, 2016

|  | Capital Stock | | Gross Paid in and Contributed Capital | | Unassigned Surplus | | Total |
|---|---|---|---|---|---|---|---|
| Beginnng Balance (2011) | $ | 4,200,000 | $ | 16,800,000 | $ | (694,199) | $ 20,305,801 |
| 2012  1 | | | | | | 888,299 | 888,299 |
| 2012  2 | | | | (16,000,000) | | | (16,000,000) |
| 2013  1 | | | | | | (88,877) | (88,877) |
| 2014  1 | | | | | | (1,842,287) | (1,842,287) |
| 2014  2 | | | | (267,406) | | | (267,406) |
| 2014  3 | | | | (2,109,282) | | | (2,109,282) |
| 2014  4 | | | | 47,219,559 | | | 47,219,559 |
| 2015  1 | | | | | | (13,378,332) | (13,378,332) |
| 2015  2 | | | | 19,100,000 | | | 19,100,000 |
| 2016  1 | | | | | | (23,379,416) | (23,379,416) |
| 2016  2 | | | | 19,750,000 | | | 19,750,000 |
| Ending Balance (2016) | $ | 4,200,000 | $ | 64,742,871 | $ | (38,494,812) | $   50,198,059 |

(1) Aggregates net income, change in unrealized capital gains(losses), change in unrealized foreign exchange gain(losses), change in net deferred income tax, change in non- admitted assets, change in reinsurance for unauthorized reinsurers.
(2) Dividends and distributions were approved by the Board.
(3) Aggregate Write-ins for gains and losses in surplus.
(4) Capital contributions received from parent.

## SCHEDULE OF EXAMINATION ADJUSTMENTS

No examination changes were made as a result of this examination.

## NOTES TO FINANCIAL STATEMENTS

**Note 1 – Bonds**                                                     **$50,843,189**

The above-captioned amount, which is the same as that reported by the Company in its

Annual Statement, has been accepted for purposes of this report.  With the exception of bonds

held for statutory purposes, investments are held by BNY-Mellon under a custodial agreement.

A review of corporate records indicates that the Board has approved the Company's investment

transactions made during the examination period in accordance with 18 *Del. C.* § 1304.

Hamilton Specialty Insurance Company

Bonds designations as rated by the NAIC are as follows:

| Designation | Book Value | Percentage of Portfolio |
|---|---|---|
| NAIC 1 | $50,546,699 | 99.42% |
| NAIC 3 | 296,490 | 0.58% |
| Total | $50,843,189 | 100.00% |

The Bond portfolio as of December 31, 2016, consisted of the following classes:

| Description | Book/Adjusted Carrying Value | Percent of Total |
|---|---|---|
| US Government Bonds | $7,326,637 | 14.41% |
| Canadian Government Bonds | 0 | 0.00% |
| Foreign Government Bonds | 0 | 0.00% |
| US Political Subdivisions | 550,629 | 1.08% |
| US Special Revenue | 12,977,711 | 25.53% |
| US Industrial and Miscellaneous | 27,079,396 | 53.26% |
| Canadian Industrial and Miscellaneous | 0 | 0.00% |
| Foreign Industrial and Miscellaneous | 2,908,816 | 5.72% |
| Total | $50,843,189 | 100.00% |

## Note 2 – Common Stock                                                     $21,658,006

The common stock balance consists of the 100% ownership of direct subsidiary HIC. The reported value agrees to the reported policyholder surplus of HIC.

## Note 3 – Other Invested Assets                                            $8,177,433

The reported balance consists of the Company's 0.48% ownership in the affiliated Two Sigma Hamilton Fund, LLC. This investment was sold in 2017.

## Note 4 - Losses                                                           $6,568,840
### Loss Adjustment Expenses                                                 $2,112,883

The above-captioned amounts, which are the same as those reported by the Company in its Annual Statement, have been accepted for purposes of this report.

Hamilton Specialty Insurance Company

### Losses

| Reported Losses (Case) | |
|---|---|
| Direct | $9,166,018 |
| Reinsurance Assumed | 0 |
| Reinsurance Ceded | (7,060,793) |
| Net Reported Losses | $2,105,225 |

| Incurred but not reported (IBNR) | |
|---|---|
| Direct | $22,462,730 |
| Reinsurance Assumed | 60,317 |
| Reinsurance Ceded | (18,049,432) |
| Net IBNR | $4,463,615 |

| Net Losses Unpaid | $6,568,840 |
|---|---|

| Loss Adjustment Expenses | $2,112,883 |
|---|---|

The Department retained the firm of INS Consultants, Inc. (INS) to review the Company's stated reserves. INS was provided with the Company's statement of actuarial opinion and an actuarial report as supporting documentation of the actuarial opinion with loss and loss adjustment expense reserves evaluated as of December 31, 2016. In addition, INS was provided with other reports, schedules, exhibits and relevant information as requested.

INS' review of loss and allocated loss adjustment expenses (ALAE) reserves consisted of separately analyzing the Company's property and casualty books of business on a gross and net basis. In addition, for unallocated loss adjustment expenses (ULAE), the consulting actuary reviewed the methodology employed by the Company's actuaries. INS accepted the methodology and factor selections utilized by the Company's actuaries and ultimately found the Company's reserves to be reasonable.

In conjunction with the actuarial review, the examination team validated loss data used by the Company without material exception.

20

Hamilton Specialty Insurance Company

## ANALYSIS OF CHANGES IN THE FINANCIAL STATEMENTS RESULTING FROM EXAMINATION

There were no financial adjustments to the Company's financial statements as a result of this examination.

### SUBSEQUENT EVENTS

*Capital Contributions from Hamilton US*

The Company received the following capital contributions from Hamilton US subsequent to December 31, 2016:

| | |
|---|---|
| First Quarter 2017 | $7,000,000 |
| Second Quarter 2017 | 6,800,000 |
| Third Quarter 2017 | 16,980,000 |
| Total | $30,780,000 |

*Sale of Hamilton US*

On October 2, 2017, American International Group, Inc. (AIG) purchased Hamilton US from HIG, which included the Company and HIC, with the approval of the Department. On that date, AIG became the ultimate parent of the Company. In addition, on that date, AIG contributed capital of $30.0 million to HSIC, of which $20.0 million was then contributed to HIC on October 27, 2017.

As a result of the change of control noted above, the existing tax allocation agreement, the administrative services agreement and the capital maintenance agreement were all terminated effective October 2, 2017. In addition, the amended and restated 75% quota share reinsurance agreement was terminated effective September 30, 2017 and the amended and restated 90% stop loss reinsurance agreement was novated from Hamilton Re to National Union Fire Insurance Company of Pittsburgh, PA (NUFIC) effective October 1, 2017.

Hamilton Specialty Insurance Company

Furthermore, as a result of the change of control noted above, with the approval of the Department and effective October 1, 2017 through an amendment, the Company entered into the AIG tax sharing agreement. With the approval of the Department and effective October 2, 2017 through an amendment, the Company entered into the 1974 service and expense agreement with the AIG Companies whereby the Company and the AIG affiliates provide affiliated services and allocate expenses between and among the participating companies. With the approval of the Department and effective October 1, 2017, the Company entered into an 85% quota share reinsurance agreement and a stop loss reinsurance agreement with NUFIC.

*Correction of Error*

During 2017, the Company identified a correction that resulted in an after-tax statutory adjustment to beginning capital and surplus of $1,200,000. The decrease in liabilities is a result of an overstatement of accrued expenses. In accordance with SSAP 3, a correction of the error has been reported in the 2017 annual statement as an increase adjustment to unassigned funds (surplus) and disclosed at Note 14 to the financial statements of the 2017 annual statement.

*Quasi-reorganization*

On January 26, 2018, the Department approved the Company's request for a quasi-reorganization under SSAP 72. As a result, the Company is allowed to restate its financial statements such that negative unassigned funds (surplus), in the amount of $(39,605,695) as of December 31, 2017, will be netted against gross paid in and contributed surplus. This restatement allows the Company to reflect its post-acquisition performance on the unassigned funds (surplus) line.

22

Hamilton Specialty Insurance Company

*Corporate Name Change*

The Company filed a certificate of amendment to its certificate of incorporation with the Delaware Secretary of State on October 17, 2017, changing the Company's name to Blackboard Specialty Insurance Company effective February 1, 2018.  On that same date, the Company moved its administrative offices to 120 Broadway, 17th Floor, New York, NY 10271.

## COMPLIANCE WITH PRIOR EXAMINATION RECOMMENDATIONS

There were no prior examination recommendations.

## SUMMARY OF RECOMMENDATIONS

The custodial agreement contains all of the required protective language specified in the NAIC Handbook with the exception of Paragraph "L" which requires the custodial agreement to state: "The foreign bank acting as a custodian, or a U.S. custodian's foreign agent, or a foreign clearing corporation is only holding foreign securities or securities required by the foreign country in order for the insurer to do business in that country.  A U.S. custodian must hold all other securities."

*It is recommended that the Company amend its custodial agreement to comply with NAIC Handbook guidelines.*

## CONCLUSION

The assistance of Delaware's consulting actuarial firm, INS Consultants, Inc. and INS Services, Inc. is acknowledged.  In addition, the assistance and cooperation of the Company's

23

Hamilton Specialty Insurance Company

outside audit firm, E&Y, and the Company's management and staff were appreciated and are acknowledged.

Respectfully submitted,

Andrew Chiodini, CFE
Examiner-In-Charge
Delaware Department of Insurance

Anthony Cardone, CPA CFE
Administrative Supervisor
Delaware Department of Insurance

# EXHIBIT D



DONNA LAGANA SILVA, ESQ.

CHRISTINA N. LAGANA, ESQ.

June 14, 2018

**VIA FIRST CLASS MAIL AND EMAIL**
Mr. Kirk Paul
York Risk Services Group
P.O. Box 183188
Columbus, OH 43218-3188

      RE:   Insured:     Ultimate Classic Construction
              Claim No:   BAWT-0036A2

Dear Mr. Paul:

As you are aware, this office represents Ultimate Classic Construction ("Ultimate") for the claim and matters related to 301 Huron Ave., Cambridge, Massachusetts.

Unfortunately, this claim has mushroomed into an issue more problematic than it began. Ultimate does hundreds of projects with great care and attention to detail, but still responsibly carries and maintains liability insurance to protect itself in the event a mistake occurs that causes damage. Accordingly, on January 15, 2018 when it became clear that work performed by Ultimate may have caused significant damage to a home, the company submitted the claim to its insurer to remedy the problem in a timely and efficient manner.

When eight (8) weeks had passed since Ultimate originally made the claim, but no progress had been made toward resolution, I was asked to step in and help facilitate the process. I was directed to the adjuster, James Green, at Sedgwick. James Green informed me that his unresponsiveness to Ultimate's calls, voicemails, and emails was attributable to his inability to determine liability and coverage because answering the question of whether Ultimate constructed an incorrect drywell that resulted in flooding and water damage was "beyond his qualifications." For indiscernible reasons, James Green did not take the necessary steps to get a qualified party involved to inspect and determine liability until I pushed the issue to his supervisor. Then, Mr. Green delayed the process further by taking several days to contact the expert investigator, EFI Global.

EFI Global performed its inspection some time in May and its report was available at least by May 30th, if not sooner. Upon following up with this matter on June 1st, I was informed that the claim had been transferred to your office and we spoke on the phone regarding status. I emphasized how long this claim has been dragged out and the ramifications it is having on Ultimate's reputation, its relationship with business partners, and the condition of the property the homeowners are living in. We agreed that I would forward the information that I have (which I did) and that you would forward the report from EFI Global as soon as it became available.

When my emails of June 4th and June 6th went unreturned, I called your office on June 12th to follow up, but learned from your voicemail that you are on vacation. I was then transferred to your supervisor, who, apparently, is also on vacation. Then I was transferred to Garvin Gray, who informed me that York has been in possession of the report from EFI Global since June 1, 2018. Garvin Gray, in a rather rude manner, went on to tell me that he could neither help nor forward a copy of the report (which Ultimate is entitled to).

I then emailed Pete Hansen at Cunningham Lindsey who had been overseeing the claim, only to find out that he is no longer with the company. Consequently, Dan Daniel, who recommended that I contact Jim Devall for technical information, responded to my email to Pete Hansen. Dan Daniel also copied Carol Potter, the original claim examiner, and Regina Cedeno at Blackboard Insurance on the email. I then spoke with Regina Cedeno over the phone, explained that this claim has been a fiasco and asked that she forward the report by EFI Global to my office, which she agreed to. The conversation was memorialized by an email. Regina Cedeno did not send the report and instead sent another email telling me to send you a letter of representation and to cease communications with Cunningham Lindsey. At the same time, I am being contacted by Jim Devall and Carol Potter of Cunningham Lindsey.

Please know that I understand you were only recently assigned this claim and that everyone is entitled to take a vacation, however, this has spiraled out of control and far beyond a reasonable timeline. My client is under tremendous pressure from the other businesses it contracts with and the homeowners, to resolve this matter. I cannot keep responding to my client's status inquiry that there is an administrative mess preventing it from resolving this issue. Ultimate is now suffering consequential monetary damages as a result of the improper handling of this claim, which warrants a 93A claim against its own insurance provider.

As of the date of this letter, Ultimate submitted this claim to its insurer five (5) months ago and has not been able to even get an answer on whether the damage will be covered, let alone any payments for repairing the damage.

Kindly, provide (1) an update on claim status, (2) dates certain that payments will be made to remedy the damage to 301 Huron Ave, (3) the report by EFI Global, and (4) a copy of Ultimate's coverage selection page.

Very truly yours,

Christina N. Lagana
CNL@LaganaSilva.com

CNL/kb

cc:     Regina Cedeno
        Richard Blair
        Dan Daniel
        Jim Devall
        Carol Potter
        Ultimate Classic Construction

# EXHIBIT E



DONNA LAGANA SILVA, ESQ.

CHRISTINA N. LAGANA, ESQ.

June 29, 2018

**VIA CERTIFIED MAIL & EMAIL**
Mr. Kirk Paul
York Risk Services Group
P.O. Box 183188
Columbus, OH 43218-3188

DEMAND PURSUANT TO M.G.L. c. 93A

RE:   Insured:     Ultimate Construction
      Claim No:    BAWT-0036A2

Dear Mr. Paul:

As you are aware, this office represents Ultimate Construction ("Ultimate") for the claim and matters related to 301 Huron Ave., Cambridge, Massachusetts. This office sent a letter via mail and email on June 14, 2018 and followed up via phone and email, without response, multiple times since. Accordingly, please consider this letter a formal demand for payment on the claims arising from and related to the damage at 301 Huron Ave, Cambridge, Massachusetts.

This claim has been grossly mishandled to the detriment of the insured and the insured's clients. Further, as explained and reiterated by the letter dated June 14, 2018, this claim was filed more than six (6) months ago and an expert inspection report was made available to your office a month ago, yet no action has been taken. The willful and wanton omission of duties owed to your insured is an unfair and deceptive practice in violation of M.G.L. c. 93A.

Please forward payments for damage as previously indicated by invoices and estimates forthwith.

Very truly yours,

Christina N. Lagana
CNL@LaganaSilva.com

CNL/kb

cc:   Ultimate Classic Construction

enclosure

# EXHIBIT F

**Paul, Kirk**

| | |
|---|---|
| **From:** | Paul, Kirk |
| **Sent:** | Friday, July 13, 2018 3:57 PM |
| **To:** | cnl@laganasilva.com |
| **Subject:** | File # BAWT-0036A2 |
| **Attachments:** | BAWT-0036A1 Expert Report.pdf |
| | |
| **Categories:** | DISCOVERY TEAM, Blackboard/Open Blackboard Files |

Christina

I acknowledge your letter of June 14, 2018 and as you requested, here is the EFI Global report that was completed at the request of the
prior TPA.  I realize that this matter has gone on for some time, but
the more that I get into the file, the more questions I have.

I do want see what we can do to bring this case to a resolution, but we still have insufficient information in our file to
assess the damages to the claimant's basement.

In going through the file, I would like to know if Ultimate Classic used a subcontractor to dig the drywell? If so, I would
like a copy of that subcontract

Thanks for your patience.

Kirk

--

Kirk J. Paul, CPCU, ARM
Complex Commercial Claims Adjuster
Claims
609.807.9391 office

kirk.paul@yorkrsg.com email
York Risk Services Group
P.O. Box 183188
Columbus , OH 43218-3188

Stay connected with York

1

# EXHIBIT G

6/1/2020    Sedgwick Closes on Acquisition of York Risk Services



Featured Stories

More States Push COVID-19 Claims to Work Comp; Potential Cost... (https://www.claimsjournal.com/news/national/2020/05/19/297138.htm)

Work Comp May Need Backstop as Presumptions Push Claim Costs... (https://www.claimsjournal.com/news/national/2020/05/11/296987.htm)

Language in Emergency Orders Gives Ammo to Plaintiffs in... (https://www.claimsjournal.com/news/national/2020/05/13/297037.htm)

Willis: COVID-19 Losses Offset by Reduced Claims for Auto Lines (https://www.claimsjournal.com/news/national/2020/05/04/296865.htm)

Jobs (/jobs/)        Events (/events/)        Videos/Podcasts (https://www.insurancejournal.tv/channels/claims/)        Newsletters (/subscribe/)



(https://ra.wellsmedia.com/www/delivery/ck.php?
oaparams=2__bannerid=9189__zoneid=19__cb=306cc4617c__oadest=https%3A%2F%2Frimkus.com%2Fpractice-areas%2Fforensic-accident-
reconstruction)

## Sedgwick Closes on Acquisition of York Risk Services

September 4, 2019

✉ Email This (mailto:?

subject=Sedgwick%20Closes%20on%20Acquisition%20of%20York%20Risk%20Services&body=Sedgwick%20Closes%20on%20Acquisition%20of%20York%20R|

📧 Subscribe to Newsletter (/subscribe/)

✉   f   y   in   🖨

Article (https://www.claimsjournal.com/news/national/2019/09/04/292924.htm)

0 Comments (https://www.claimsjournal.com/news/national/2019/09/04/292924.htm/?comments) ·

Insurance and benefits claims firm Sedgwick said it has completed its purchase of York Risk Services Group,
which offers claims administration, managed care and loss adjusting services.

The acquisition plan was first announced (https://www.claimsjournal.com/news/national/2019/07/09/291842.htm) in July. The
purchase marks Sedgwick's third acquisition of a TPA in five years. The Memphis, Tennessee-based company purchased
We have updated our privacy policy to be more clear and meet the new requirements of the GDPR. By continuing to use our site, you accept our revised
Cunningham Lindsey in 2018 and T&T Global Holdings, owner of VeriClaim, in 2017.
Privacy Policy (/privacy).

OK    ✕

# EXHIBIT H

LAW OFFICES OF

# ALAN M. COHEN LLC

550 WORCESTER ROAD
FRAMINGHAM, MA 01702

(508) 620-6900                                    FAX (508) 620-9696

April 24, 2020

Kirk Paul and Richard Blair
York Risk Services Group, Inc.
P.O. Box 183188
Columbus, OH 43218

Hamilton Specialty Insurance Co.      inTrust
68 Bonair Street, #3                  P.O. Box 703689
Somerville, MA 02145                  Dallas, TX 75370

Nancie Langlais
AmWINS Access Insurance Services      Cunningham Lindsey US Inc
2 Rosenfeld Drive                     139 Newbury St
Hopedale, MA 01747                    Framingham, MA 01701

Blackboard U.S. Holdings, Inc.        Juliana Matos
f/k/a Hamilton U.S. Holdings          Discovery Insurance Agency
120 Broadway                          25 Iyanough Road
17th Floor                            Hyannis, MA 02601
New York, NY 10271

Re:  Ultimate Classic Construction Inc. and 301 Huron Avenue,
     Cambridge, MA
     Policy No. AAHS1000014100
     Claim No. BAWT-0036A2
     Claim No. 701360112896
     Your File No. 701360112896-001
     Our File No. L6671

          <u>DEMAND PURSUANT TO M.G.L. 176D AND 93A SECTIONS 2 AND 11</u>

To each of you:

     Please be advised that this office represents your insured
Ultimate Classic Construction Inc. ("Ultimate") concerning the
above referenced matter. This is a formal written demand for
payment on the claims arising from the January 19, 2018 reported
loss at Huron Avenue, Cambridge, Massachusetts. Ultimate intends

Ultimate Classic Construction Inc. and 301 Huron Avenue
April 24, 2020
Page Two

to seek all of its cost, losses, damages, and attorney fees
incurred pursuant to M.G.L.c. 176D as liability has been
established and no issue has been raised as to the amount of
damages. We will also be seeking treble damages pursuant to c.
93A Sections 2 and 11, a copy of the policy is annexed hereto
and incorporated herein as "A".

    As of the date of this letter, Ultimate submitted its claim
to its insurer twenty-seven (27) months ago and has not yet
received any payment or substantive communications regarding the
claim. That is unacceptable by any standard.

    Your office is already in receipt of the May 14, 2018,
Structural Engineering Report from EFI Global, Inc. for Hamilton
Specialty Insurance Co. c/o Cunningham Lindsey after inspection
of the premises on May 10, 2018, a copy of the report is annexed
hereto and incorporated herein as "B". Your office has also
received both the June 14, 2018 and June 29, 2018 letters from
prior counsel on behalf of Ultimate, copies of the letters are
annexed hereto and incorporated herein as "C". I will not
belabor the details as you already know them.

    Demand is hereby made upon you for the immediate payment of the
sum of $300,000.00 by bank, certified or cashiers' check made payable
to "Alan M. Cohen as attorney for Ultimate Classic Construction
Inc.", a copy of the invoice for repairs is annexed hereto and
incorporated herein as "D". If payment of said amount is not received
within ten days of the date of this letter, suit shall be commenced in
which my client will be seeking the full principal which according to
our client exceeds $300,000.00, interest, and attorney fees pursuant
to contract and treble but not less than double damages pursuant to
c. 176D and c. 93A.


    Govern yourself accordingly.

                              LAW OFFICES OF ALAN M. COHEN LLC

                              By: _____
                                    Alan M. Cohen

AMC/gw
cc:  Lincoln Fonte
     Scott Shuster

# EXHIBIT A



# General Liability Binder

Expires: 10/10/2017
Transaction Type: New

Access
2 Rosenfeld Drive
Hopedale, MA 01747

T  508.902.9711 x227
F  774.396.0067

July 13, 2017

JULIANA MATOS
Discovery Insurance Agency
25 Lyannough Rd
Hyannis, MA 02601

## Overview

We have received the following General Liability Binder for the captioned insured. Please review carefully and advise at your earliest convenience.

| | | |
|---|---|---|
| POLICY NUMBER: | AAHS1000014100 | |
| POLICY PERIOD: | From 7/12/2017 to 7/12/2018 | |
| CARRIER: | Hamilton Specialty Insurance Company | |
| | View A.M. Best Rating | |
| APPLICANT: | ULTIMATE CLASSIC CONSTRUCTION INC | |
| MAILING ADDRESS: | 68 BONAIR STREET APT 3 Somerville, MA 02145 | |
| COMMISSION: | 10.000% | |
| MINIMUM EARNED PREMIUM: | 25% | |

| | |
|---|---|
| Premium: | $797.00 |
| Fees*: | $135.00 |
| Taxes**: | $31.88 |
| Total: | $963.88 |

State Tax and fees are subject to change due to state legislation at the time of binding.



# General Liability Coverage

## Limits

| Type | Limit |
|------|-------|
| General Aggregate | $2,000,000 |
| Products & Completed Operations | $2,000,000 |
| Each Occurrence | $1,000,000 |
| Personal & Advertising Injury | $1,000,000 |
| Damage to Rented Premises | $500,000 |
| Medical Expenses | $10,000 |

## Deductible

| Type | Amount |
|------|--------|
| None | |

## Class Codes

| Territory | Class Code | Description | Exposure | Basis | Rate | Premium |
|-----------|-----------|-------------|----------|-------|------|---------|
| MA-514: Boston, Cambridge, Everett, Chelsea, Revere and Sommerville | 91340 | (91340) Carpentry - construction of residential property not exceeding three stories in height | 22,000 | Payroll | Prem/Ops Rate = 17.0080 Prod/Ops Rate = 19.2080 | $797.00 |

July 13, 2017



# Forms

| Form | Edition | Description |
|------|---------|-------------|
| HU0101 | (03/15) | Service of Suit |
| HU0102 | (03/15) | Claims Handling Notice |
| HU0104 | (03/15) | Policyholder Disclosure Acceptance / Rejection of Terrorism Insurance Coverage |
| HUDS01 | (03/15) | COMMON POLICY DECLARATIONS |
| HUDS02 | (03/15) | Signature Endorsement |
| IL0003 | (09/08) | CALCULATION OF PREMIUM |
| IL0017 | (11/98) | COMMON POLICY CONDITIONS |
| ILP001 | (01/04) | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| CG0001 | (04/13) | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG2101 | (11/85) | EXCLUSION - ATHLETIC OR SPORTS PARTICIPANTS |
| CG2107 | (05/14) | Exclusion - Access or Disclosure of Confidential or Personal Info & Data-Related Liability - Limited BI Exception Not Included |
| CG2147 | (12/07) | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG2152 | (04/13) | EXCLUSION - FINANCIAL SERVICES |
| CG2154 | (01/16) | EXCLUSION - DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM |
| CG2165 | (12/04) | TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION |
| CG2167 | (12/04) | FUNGI OR BACTERIA EXCLUSION |
| CG2173 | (01/15) | EXCLUSION OF CERTIFIED ACTS OF TERRORISM |
| CG2186 | (12/04) | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS |
| CG2196 | (03/05) | SILICA OR SILICA-RELATED DUST EXCLUSION |
| CG2233 | (04/13) | EXCLUSION - TESTING OR CONSULTING ERRORS AND OMISSIONS |
| CG2234 | (04/13) | EXCLUSION - CONSTRUCTION MANAGEMENT ERRORS AND OMISSIONS |
| CG2243 | (04/13) | EXCLUSION - ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY |
| CG2279 | (04/13) | EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY |
| CG2284 | (11/94) | MASSACHUSETTS CHANGES - COVERAGE FOR LEAD POISONING ENDORSEMENT |
| CGP006 | (03/05) | EXCLUSION - SILICA OR SILICA-RELATED DUST ADVISORY NOTICE TO POLICYHOLDERS |
| CL0501 | (05/15) | SPECIAL CONDITIONS - SUBCONTRACTORS |
| CL0502 | (05/15) | SUBCONTRACTORS - DEFINITION OF ADEQUATELY INSURED |
| CL2107 | (03/15) | Lead Exclusion |
| CL2108 | (03/15) | ASBESTOS EXCLUSION |
| CL2114 | (05/15) | NEW RESIDENTIAL CONSTRUCTION LIMITATION |
| CL2115 | (05/15) | CROSS SUITS LIABILITY EXCLUSION |
| CL2116 | (05/15) | EARTH MOVEMENT EXCLUSION |
| CL2120 | (05/15) | EXCLUSION INJURY TO INDEPENDENT CONTRACTORS |
| CL2126 | (02/16) | Professional Medical Services Exclusion |
| CL2402 | (03/15) | Communicable Disease Limitation |
| CLDS01 | (03/15) | COMMERCIAL GENERAL LIABILITY DECLARATIONS |
| HUN117 | (05/15) | COMMUNICABLE DISEASE EXCLUSION ENDORSEMENT ADVISORY NOTICE TO POLICYHOLDERS |



| IL0021 | (09/08) | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
|---|---|---|

## Conditions

The insured's premises and operations are subject to inspection and compliance with any resulting recommendations.

Premium charges for Additional Insured(s) and Waiver of Subrogation may be fully earned at inception.

Unless otherwise indicated, premium is due within 20 days of binding. Premiums not received within this time period may result in Notice of Cancellation.

This is the premium due at inception. The final premium will be determined after an audit of the insured's records. Final adjustments to the premium will be made according to the rate(s) on the policy. Adjustments will only be made for Additional Premiums. No return premium shall be forthcoming.

Once the policy is bound some premium will be earned (as reflected in minimum earned premium). There are no flat Cancellations allowed.

## *Fees

| State | Fee | Taxable | Amount |
|---|---|---|---|
| MA | AmWINS Inspection Fee | No | $45.00 |
| MA | AmWINS Service Fee | No | $90.00 |
| Total Fees Due | | | $135.00 |

## **Taxes

| State | Description | Taxable Premium | Taxable Fee | Tax Basis | Rate | Amount |
|---|---|---|---|---|---|---|
| MA | Surplus Lines Tax | $797.00 | $0.00 | $797.00 | 4.000% | $31.88 |
| Total Surplus Lines Taxes Due | | | | | | $31.88 |

Sincerely,

Nancie Langlais
Senior Vice President | AmWINS Access Insurance Services, LLC
T  508.902.9711 x227  |  F  774.396.0057  |  Nancie.Langlais@amwins.com
2 Rosenfeld Drive  |  Hopedale, MA 01747  |  amwins.com

An AmWINS Group Company

July 13, 2017

# EXHIBIT B



**Engineering**



## Structural Engineering Report



**Fire Investigations**

Insured: Ultimate Construction
Address of Loss:   301 Huron Avenue
                   Cambridge, MA 02138
Claim Number:      701360112896

Prepared For:

Hamilton Specialty Insurance Co.
C/o Cunningham Lindsey
P.O Box 703689
Dallas, TX 75370
ATTN: Mr. James Green

EFI Project No.: 98350-06929



**Environmental Consulting**

May 14, 2018



**Specialty & Consulting**

Prepared By:

EFI Global, Inc.
155 West Street, Suite 6
Wilmington, Massachusetts 01887
Toll Free (800) 659-1202



**Catastrophe Response**

Emergency 24 Hours:  888.888.2467
www.efiglobal.com



EFI Global

Engineering, Fire &
Environmental Services

155 West Street
Suite 6
Wilmington, MA 01887
T: 978-688-3736
TF: 800-559-1202
F: 976-688-5494
www.efiglobal.com



**EFI Global**

Engineering, Fire &
Environmental Services

May 14, 2018

Mr. James Green
Hamilton Specialty Insurance Company
C/o Cunningham Lindsey
P.O Box 703689
Dallas, TX 75370

RE:   Structural Engineering Report
      Insured: Ultimate Construction
      Loss Location: 301 Huron Avenue,
                     Cambridge, MA, 02138
      Date of Loss: January 19, 2018
      Claim Number: 701360112896
      EFI File No.: 98350-06929

Dear Mr. Green,

As requested, EFI Global, Inc. (EFI) has completed a forensic investigation of the property located at 301 Huron Avenue, Cambridge, Massachusetts. Our findings, analysis, and conclusions are included herein.

This report contains a discussion of the information gathered during the investigation, analysis and conclusions with respect to the condition of the subject site at the time of EFI's inspection. The conclusions contained herein are based on information available to date.

This written report is the response to your request for an engineering investigation at the property and should be read in full.

<u>ASSIGNMENT</u>

EFI received an assignment from James Green of Cunningham Lindsey to inspect the water intrusion that occurred at the property located at 301 Huron Avenue, Cambridge, MA. The reported date of loss (DOL) was January 19, 2018; however onsite, the representative for the insured stated it occurred sometime between January 10, 2018 and January 14, 2018. In response to this request, EFI contacted Ed Corea of Ultimate Construction to set an appointment to investigate the loss. Gordon MacKenzie, PE examined the site on May 10, 2018. Ed Corea was present during the inspection.

*Insured: Ultimate Construction*
*Claim No: 701360112096*
*EFI No: 98350-06929*
*May 14, 2018*

## BACKGROUND INFORMATION

The following information was gathered during the claim examination on May 10, 2018 through visual inspection and conversations with Ed Corea:

- Ultimate Construction was to do interior demolition (completely gut the interior), and remodel the structure.
- When the job was started, there was no sump pump present in the basement.
- A foundation perimeter drain was installed around the entire foundation, with the water discharging into a drywell that was to be constructed.
- The leaders to all gutters (except porch gutters) was directed to the same drywell that was to be constructed.
- As part of the job, a sump pump was to be installed, and discharged into the drywell to be constructed.
- At the time the job was started (approximately 1 year ago), the City of Cambridge would not allow connection to the city drainage system without prior approval.
- The neighbor's garage to the rear of the structure was previously flooded from roof drainage.
- The water intrusion on the date of the loss deposited approximately 8" of water on the basement floor.
- A second sump pump was installed after the loss.
- After the loss, the City of Cambridge inspected the dry well (after its contents were excavated), and granted Ultimate Construction permission to connect 100% of the roof drainage system to the city drainage system.
- The sump pump was connected and working at the time of the loss.
- The loss occurred between January 10, 2018 and January 14, 2018.
- The drywell that was constructed was 72" in diameter by 72" deep.
- The sump pump discharge pipe entered the drywell 30" below grade.
- Two 4" diameter pipes located 6" below grade were temporary pipes to carry roof drainage to the drywell, until the city connection to the drainage system could be made.

The following information was gathered after speaking with Ms. Kara Falise, of the City of Cambridge Building Department:

- The City of Cambridge does not allow connection to the city drainage system without prior approval.
- Installation of a dry well to collect roof drainage is not a requirement.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98250-06929*
*May 14, 2018*

- The only requirement for roof drainage is that it cannot be discharged over city walkways.
- After the loss, the City granted permission to connect 100% of the roof drainage to the city drainage system.

## PROTOCOL FOR SITE INVESTIGATION

This report is based on a visual inspection of the damages at the above referenced structure. No destructive investigation was performed. The construction drawings were not reviewed prior to writing this report. The observations and recommendations are based only on the visible portions of the structure at the time of the investigation.

## BUILDING/SYSTEM DESCRIPTION

The home is a three story wood structure built in 1909. The structure is being converted to three condominium units of varying sizes. The house rests on a stone foundation, and is situated on a relatively small lot (estimated to be 1/4 acre or less).

## OBSERVATIONS

The following observations were noted during the claim examination on May 10, 2018:

- At the time of the inspection, the basement was dry, and water proofing was installed along the perimeter of the foundation (post loss).
- Approximately 24" of drywall was removed at the bottoms of all basement interior walls.
- Two new sump pumps were installed. The second sump pump was installed after the loss.
- A 4' diameter by 4' deep drywell was excavated, and located approximately 30' from the rear corner of the foundation. Two 4" diameter pipes entered the drywell, approximately 6" below grade.
- The earth forming the walls of the drywell was clayey/silty soil.
- Temporary piping was installed to carry the roof drainage to the drywell at the rear of the property.
- The land in the rear of the property slopes gently down, and away from the structure.
- The neighbor's stone garage abuts the rear property line. The slab elevation of this garage is at a significantly lower elevation than the rear yard to the subject property.
- The sump pump that was installed at the time of the loss was approximately 60' from the drywell.
- It was unclear what the drywell was filled with, as the spoils appeared to be rocky fill with clayey/silty filler material.
- The sump pump was not removed during the inspection, nor was its operation checked.

*Insured: Ultimate Construction*
*Claim No: 701350112896*
*EFI No: 98350-06929*
*May 14, 2018*

- The sump pump had a backup battery system which would operate the sump pump in the event of a power failure.

## DISCUSSION

Although the City did not require a drywell to accept roof drainage, the contractor was told that the abutting property to the rear of the subject property was previously flooded by groundwater. As the rear yard to the subject property gently slopes toward the abutting neighbor's property, and the abutting neighbor's property is at a lower elevation, this could be expected. To remedy this condition, Ultimate Construction determined that a drywell would solve the problem. Unfortunately, Ultimate Construction did not engage the services of an engineer to design the drywell, nor did they engage the services of a testing company to conduct a percolation test of the soil in the vicinity of the drywell.

The soil in which the drywell was constructed was clayey/silty soil, which historically does not drain well, and has a poor perc rate, which could be as high as 60 minutes per inch. What this means is that the soil drains extremely slowly, and is not acceptable for use in a drywell. When the city inspector saw the type of soil in which the drywell was constructed, she authorized Ultimate Construction to connect to the city drainage system.

On January 13, 2018, approximately 1.25" of rain fell. The drywell was incapable of handling the entire roof drainage area (approximately 1,500 SF of roof area), any groundwater beneath the basement floor, as well as the water from the foundation perimeter drain. Consequently, the drywell filled with water. Ordinarily, this would not be a serious problem (for the structure under investigation), as the drywell would fill, and water would then flow toward the rear of the property, and cause problems for the abutting neighbors, which could lead to additional claims. What created the problem for this structure was the fact that the sump pump was connected to this drywell, which provided an avenue for water intrusion, through the discharge pipe. The elevation of the top of the drywell is well above the basement sump pump, and the basement sump pump likely could not develop the required head to overcome this elevation change, as well as the pipe friction loss due to elbows, and 60 lineal feet of pipe. Thus the water flowed through the sump pump pipe, and into the basement. The specifications of the sump pump were not available, and therefore not reviewed, however, overcoming approximately 60 lineal feet of discharge pipe, elevation changes, and bends and turns in the pipe would require a relatively powerful pump.

It is unlikely the water intrusion between January 10, 2018 and January 14, 2018 was from a high ground water table, since the basement had no sump pump prior to the renovations. Had groundwater table been an ongoing problem with this structure, a sump pump would most likely have been present or evidence of past, regular water intrusion into the basement would have been observed or reported. In addition, the groundwater table is typically lower during the winter months (when this loss occurred), and rises in the spring.

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-06929*
*May 14, 2018*

### RESULTS OF THE INVESTIGATION (CONCLUSIONS)

Based on the work of EFI, the following has been determined:

- It is EFI's opinion that the water intrusion was caused by an inadequately designed and constructed drywell, which allowed water to flow from the drywell through the sump pump discharge pipe, and into the basement.

### QUALIFICATIONS

The information presented in this report addressed the limited objectives related to the evaluation of the loss at 301 Huron Ave, Cambridge, Massachusetts. This report only describes the conditions present at the time of our evaluation. It is not intended to fully delineate or document every defect or deficiency throughout the subject property. If any additional information is encountered which relates to this evaluation, EFI reserves the right to alter the opinions contained in this report. In some cases, additional studies may be warranted to fully evaluate concerns noted.

The findings noted herein do not constitute a scope of work for repair or offer of repair. Detailed design documents should be prepared to accurately reflect the scope of any repair work and competitive bids obtained to determine actual repair costs.

Our services have been performed using that degree of skill and care ordinarily exercised under similar conditions by reputable members of EFI's profession practicing in the same or similar locality at the time of performance.

Any oral statements made before, during, or after the course of the investigation were made as a courtesy only and are not considered a part of this report.

*Insured: Ultimate Construction*
*Claim No: 701360112895*
*EFI No: 98350-06929*
*May 14, 2018*

## CLOSING

EFI appreciates this opportunity to provide consulting services for Hamilton Specialty Insurance Company and Cunningham Lindsey in this matter. Please contact us should any questions arise concerning this report, or if we may be of further assistance.

Respectfully submitted,
EFI Global, Inc.:

Gordon J. MacKenzie, MS, P.E, CSP
Professional Engineer
MA PE License No: 31218

Peer Review

Sarah Byer
Structural Engineer

Attachments:  Photograph Log

*Insured: Ultimate Construction*
*Claim No: 701350112896*
*EFI No: 98250-05929*
*May 14, 2018*

## PHOTOGRAPHS



Photo 1) This photograph shows an aerial view of property.



Photo 2) This photograph shows the front elevation of the property.

Insured: Ultimate Construction
Claim No: 701360112896
EFI No: 98350-06929
May 14, 2018



Photo 3) This photograph shows the right elevation of the property viewed from the street).



Photo 4) This photograph shows the right elevation of the property viewed from the street).



Photo 6) This photograph shows the rear elevation the

Photo 5) This photograph shows the left elevation the street).

Insured: Ultimate Construction
Claim No: 701360112895
EFI No: 98350-06929
May 14, 2018

*Insured: Ultimate Construction*
*Claim No: 7013601112896*
*EFI No: 98350-06929*
*May 14, 2018*



Photo 7) This photograph shows the rear elev... ...t th...



Photo 8) This photograph shows interior ...

Insured: Ultimate Construction
Claim No: 701360112896
EFI No: 96350-06929
May 14, 2018



Photo 9) This photograph shows interior has next walls.



Photo 10) This photograph shows interior base

*P*

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 90350-06929*
*May 14, 2018*

Photo 11) This photograph shows the stone fc la n w

Uninterruptible power supply for sump pump

Photo 12) This photograph shows the sec: f sun

Insured: Ultimate Construction
Claim No: 701360112856
EFI No: 90350-06929
May 14, 2018



Photo 13) This photograph shows the master p          for t     pun      led
at the time of the loss.



Photo 14) This photograph shows the bas       w:     ofin    'alle   after

13



Photo 16) This photograph shows temporarily connection is made.

Photo 15) This photograph shows the sump ump installed at the time of the loss.

Insured: Ujjimala Construction
Claim No: 70135011_896
EFI No: B9350-06929
May 14, 2018

Photo 17) This photograph shows temp ary .

Excavated drywell
Temporary piping (post loss)

Photo 18) This photograph shows th va ywel s at was flooded in the past (arrows).

Insured: Ultimate Construction
Claim No: 701360112895
EFI No: 98350-05929
May 14, 2018



Photo 19) This photograph shows a clos⋯ ⋯f the d⋯



Photo 20) This photograph shows a v⋯ ⋯nd⋯

*Insured: Ultimate Construction*
*Claim No: 701360112896*
*EFI No: 98350-05929*
*May 14, 2018*



Photo 21) This photograph shows what was presumably



Photo 22) This photograph shows the

EXHIBIT



D   ... :GANA SILVA, ESQ.
C   ST :A N. LAGANA, ESO.

Ju~e 1  '01

<u>VIA FIRST CLASS MAIL AND EMAIL</u>
Mr. Kirk Paul
York Risk Services Group
P.O. Box 183188
Columbus, OH 43218-3188

RE:   Insured:      Ultimate Classic Construction
      Claim No:     BAWT-0036A2

Dear Mr. Paul:

As you are aware, this office represents Ultimate Classic Con·      ("Ultimate")      d  claim and
matters related to 301 Huron Ave., Cambridge, Massachusetts.

Unfortunately, this claim has mushroomed into an issue more prol     ... than it be      ltimate does
hundreds of projects with great care and attention to detail, but still respo      e ·arries and n     ins liability
insurance to protect itself in the event a mistake occurs that causes damage     · :c  dingly, on     ry 15, 2018
when it became clear that work performed by Ultimate may have cau      si    fic  nt damage     me, the
company submitted the claim to its insurer to remedy the problem in      .  nt efficient r     .

When eight (8) weeks had passed since Ultimate originally made t·     n, but no p     had been
made toward resolution, I was asked to step in and help facilitate the proc·     was directed     djuster,
James Green, at Sedgwick. James Green informed me that his unresponsiv·     s t· Ultimate     . voicemails,
and emails was attributable to his inability to determine liability and cover     her use answ     ·  e question
of whether Ultimate constructed an incorrect drywell that resulted in ·   l     an  water dan     s "beyond
his qualifications." For indiscernible reasons, James Green did not ta·e th·     ary steps t     qualified
party involved to inspect and determine liability until I pushed the i     ne to      ·rvisor. Tl     ·. Green
delayed the process further by taking several days to contact the expert in     a  r, EFI Glo

EFI Global performed its inspection some time in May and its r·     is available al     ·y May 30th,
if not sooner. Upon following up with this matter on June 1st, I was i·     :  ·at  he claim l     n transferred
to your office and we spoke on the phone regarding status. I emphas·     :     n  this chain     ·en dragged
out and the ramifications it is having on Ultimate's reputation, its rel  ions     business     s, and the
condition of the property the homeowners are living in. We agreed t::: l w     ·ward the     ·ntion that I
have (which I did) and that you would forward the report from EFI Globa!     on  as it beca     ilable.

567 McGRATH HIGHWAY I SOMERVILLE, MA 02145_ I :ELEPHONE  I: 1]) 76 :       x (617) )64.

OFFICE@LAGANASILVA.COM I LAGANASILVALAW.CC

YOUR FAMILY'S LAWYERS

When my emails of June 4th and June 6th went unreturned, I called your office on June 12th to follow up, but learned from your voicemail that you are on vacation. I was then transferred to your supervisor, who, apparently, is also on vacation. Then I was transferred to Garvin Gray, who informed me that York has been in possession of the report from EFI Global since June 1, 2018. Garvin Gray, in a rather rude manner, went on to tell me that he could neither help nor forward a copy of the report (which Ultimate is entitled to).

I then emailed Pete Hansen at Cunningham Lindsey who had been overseeing the claim, only to find out that he is no longer with the company. Consequently, Dan Daniel, who recommended that I contact Jim Devall for technical information, responded to my email to Pete Hansen. Dan Daniel also copied Carol Potter, the original claim examiner, and Regina Cedeno at Blackboard Insurance on the email. I then spoke with Regina Cedeno over the phone, explained that this claim has been a fiasco and asked that she forward the report by EFI Global to my office, which she agreed to. The conversation was memorialized by an email. Regina Cedeno did not send the report and instead sent another email telling me to send you a letter of representation and to cease communications with Cunningham Lindsey. At the same time, I am being contacted by Jim Devall and Carol Potter of Cunningham Lindsey.

Please know that I understand you were only recently assigned this claim and that everyone is entitled to take a vacation, however, this has spiraled out of control and far beyond a reasonable timeline. My client is under tremendous pressure from the other businesses it contracts with and the homeowners, to resolve this matter. I cannot keep responding to my client's status inquiry that there is an administrative mess preventing it from resolving this issue. Ultimate is now suffering consequential monetary damages as a result of the improper handling of this claim, which warrants a 93A claim against its own insurance provider.

As of the date of this letter, Ultimate submitted this claim to its insurer five (5) months ago and has not been able to even get an answer on whether the damage will be covered, let alone any payments for repairing the damage.

Kindly, provide (1) an update on claim status, (2) dates certain that payments will be made to remedy the damage to 301 Huron Ave, (3) the report by EFI Global, and (4) a copy of Ultimate's coverage selection page.

Very truly yours,

Christina N. Lagana
CNL@LaganaSilva.com

CNL/kb

cc:   Regina Cedeno
      Richard Blair
      Dan Daniel
      Jim Devall
      Carol Potter
      Ultimate Classic Construction



LaganaSilva
& Associates, LLC

DONNA LAGANA SILVA, ESQ.
CHRISTINA N. LAGANA, ESQ.

June 29, 2018

VIA CERTIFIED MAIL & EMAIL
Mr. Kirk Paul
York Risk Services Group
P.O. Box 183188
Columbus, OH 43218-3188

· DEMAND PURSUANT TO M.G.L. c. 93A

RE:   Insured:      Ultimate Construction
      Claim No:     BAWT-0036A2

Dear Mr. Paul:

As you are aware, this office represents Ultimate Construction ("Ultimate") for the claim and matters related to 301 Huron Ave., Cambridge, Massachusetts. This office sent a letter via mail and email on June 14, 2018 and followed up via phone and email, without response, multiple times since. Accordingly, please consider this letter a formal demand for payment on the claims arising from and related to the damage at 301 Huron Ave, Cambridge, Massachusetts.

This claim has been grossly mishandled to the detriment of the insured and the insured's clients. Further, as explained and reiterated by the letter dated June 14, 2018, this claim was filed more than six (6) months ago and an expert inspection report was made available to your office a month ago, yet no action has been taken. The willful and wanton omission of duties owed to your insured is an unfair and deceptive practice in violation of M.G.L. c. 93A.

Please forward payments for damage as previously indicated by invoices and estimates forthwith.

Very truly yours,

Christina N. Lagana
CNL@LaganaSilva.com

CNL/kb

cc:   Ultimate Classic Construction

enclosure

567 MCGRATH HIGHWAY I SOMERVILLE, MA 02145  I TELEPHONE (617) 764-4001 I FAX (617) 764-3942
OFFICE@LAGANASILVA.COM I LAGANASILVALAW.COM

YOUR FAMILY'S LAWYERS

# EXHIBIT D



**FORTRESS CONSTRUCTON**
124 Middlesex Ave
Somerville - MA 02145
Phone (617)625-7000

**FORTRESS**
Construction Company

# STATEMENT

FINANCIAL STATEMENT # 1
DATE: JUN 25, 2018

TO:    SCOTT SHUSTER
       301 Huron Ave
       Cambridge, MA
       Ph:
       Customer ID: -

Ref: Statement Scope work
301 Huron Ave
Cambridge, MA

| CONTRACT # | JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|---|
|  | 301 Huron Ave |  |  |

| QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|
| 1 | Estimate cost for the remaining work | $102,200.00 | $102,200.00 |
| 1 | Estimated cost for Landscaping | $12,000.00 | $12'000.00 |
|  | Work alredy completed | $85,000.00 | $85,000.00 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  | Checks made to: |  |  |
|  | Fortress Construction |  |  |
|  |  | BALANCE | $119,200.00 |
|  |  | SUBTOTAL | $119,200.00 |
|  |  | SALES TAX |  |
|  |  | INVOICE TOTAL AMOUNT | $199,200.00 |

APPROVED: _____  DATE: _____
CLIENT

THANK YOU FOR YOUR BUSINESS!

# EXHIBIT I

| | | |
|---|---|---|
| Ultimate | demolition and trash Removal | 16,895.00 |
| Pereira's Construction | dig and reverse pipes for provisory water supply to street | 38,950.00 |
| | | |
| Cortez Plumbing | | 11,000.00 |
| First Choice | electric | 16,000.00 |
| | | |
| SOS Handyman | dig around perimeter of foundation to seal outside | |
| | Remove and dig driveway for pipping | 69,000 |
| | dig under two decks for pipping | |
| | dig walkway around the house for pipping | |
| | | |
| ANS Constructions | reverse gutters and downspouts | 5,800.00 |
| Busy Dog | Basement Waterproof and sump pumps and | |
| | relocated french drain | 56,000.00 |
| | | |
| SOS Handyman | Reconstruction of drive way (pavers),walkway, landscape and side fence (left house) | 48,900.00 |
| | | |
| Materials | provide by ultimate | 48,120.00 |
| | | |
| Ultimate | Labor 17 weeks(4 months) | |
| | 17x40x35,00=23,800.00 | 23,800.00 |
| | | |
| | | |
| total | | 334,465 |
| Additional damages as set forth in accompanying spread sheet | | 49362 |
| | | |
| | | |
| Total Damages As of June 1, 2020 | | 383,827 |

Home rebuild costs

| | | | | |
|---|---|---|---|---|
| | 5/11/2018 Busy Dog | waterproofing | 11420 | |
| amex | 11/20/2019 Hotel Marlowe | pick up owners | 409.72 | |
| amex | 11/22/2019 Eco Spray Insulation | insulation | 4350 | |
| amex | 11/23/2019 Hotel Marlowe | pick up owners | 57.24 | |
| amex | 11/23/2019 Derek's Kitchens | vanity replacement | 839.58 | |
| amex | 11/29/2019 Home Depot | plastering material | 2128.3 | |
| amex | 12/2/2019 Home Depot | plastering material | 95.89 | |
| amex | 11/4/2019 Home Depot | plastering material | 813.53 | |
| amex | 12/6/2019 Home Depot | finish material | 155.5 | |
| amex | 12/7/2019 Home Depot | finish material | 101.1 | |
| amex | 12/12/2019 Home Depot | finish material | 45.56 | |
| visa | 12/15/2020 Brothers Hernandez | garbage removal | 350 | |
| check 277 | Fabricio | carpentry | 850 | |
| check 278 | 11/20/2019 Mega Contractors | general contractor | 5000 | |
| amex | 12/21/2019 roma tile | tile | $5,497.35 | |
| amex | 12/30/2019 roma tile | tile | $78.34 | |
| check 279 | 12/30/2019 Mega Contractors | general contractor | 5000 | |
| check 280 | 1/31/2020 Mega Contractors | general contractor | 3800 | |
| amex | 1/31/2020 roma tile | tile | 55.51 | |
| amex | 1/31/2020 roma tile | tile | 594.14 | |
| amex | 2/3/2020 roma tile | tile | 276.69 | |
| amex | 2/4/2020 roma tile | tile | 93.75 | |
| amex | 2/5/2020 roma tile | tile | 110.51 | |
| check 281 | 2/14/2020 Long Nguyen | flooring | 500 | |
| check 282 | 2/20/2020 Alan Cohen | legal | 1500 | |
| check 283 | 2/22/2020 liberotz | plaster | 300 | |
| check 284 | 2/28/2020 Mega Construction | general contractor | 4000 | |
| check 285 | 3/13/2020 Eduardo Maha | garbage removal | 350 | |

45152.62

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                SUPERIOR COURT
                                             CIVIL ACTION NO.

ULTIMATE CLASSIC CONSTRUCTION INC.,
     Plaintiff
v.

BLACKBOARD SPECIALTY INSURANCE COMPANY
F/K/A HAMILTON SPECIALTY INSURANCE COMPANY,
YORK RISK SERVICES GROUP, INC., AND SEDGWICK,
INC.

STATEMENT OF DAMAGES

Plaintiff in the above captioned action hereby asserts that

the principal amount of money damages sought by means of the

Complaint, to which this statement of damages is attached, is

Three Hundred Eighty-Three Thousand Eight Hundred Twenty-Seven

and 62/100 ($383,827.62) Dollars, together with statutory

interest in the amount of 12% per annum from the dates of demand

as set forth in the verified affidavit, reasonable attorney's

fees and court costs.

ULTIMATE CLASSIC CONSTRUCTION INC.
By its attorney;

Alan M. Cohen BBO # 088375
Glenn Wegrzyn BBO # 676398
LAW OFFICES OF ALAN M. COHEN LLC
550 Worcester Road
Framingham; MA 01702
(508) 620-6900
acohen@collections-law.com

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                    SUPERIOR COURT
                                                CIVIL ACTION NO.

ULTIMATE CLASSIC CONSTRUCTION INC.,
     Plaintiff
v.

BLACKBOARD SPECIALTY INSURANCE COMPANY
F/K/A HAMILTON SPECIALTY INSURANCE COMPANY,
YORK RISK SERVICES GROUP, INC., AND SEDGWICK,
INC.

                  CORPORATE DISCLOSURE STATEMENT

     Now comes the plaintiff and hereby certifies that the

plaintiff has no parent corporation, and no publicly held

corporation owns ten percent or more of the plaintiff's stock.


                          ULTIMATE CLASSIC CONSTRUCTION INC.
                          By its attorney,


                          Alan M. Cohen BBO # 088375
                          Glenn Wegrzyn BBO # 676398
                          LAW OFFICES OF ALAN M. COHEN LLC
                          550 Worcester Road
                          Framingham, MA 01702
                          (508) 620-6900
                          acohen@collections-law.com

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                          SUPERIOR COURT
                                       CIVIL ACTION NO.

ULTIMATE CLASSIC CONSTRUCTION INC.,
      Plaintiff
v.

BLACKBOARD SPECIALTY INSURANCE COMPANY
F/K/A HAMILTON SPECIALTY INSURANCE COMPANY,
YORK RISK SERVICES GROUP, INC., AND SEDGWICK,
INC.

MOTION FOR SPECIAL PROCESS SERVER PURSUANT TO MASS.R.CIV.P.4(C)

      Now comes ULTIMATE CLASSIC CONSTRUCTION INC. ("plaintiff")

and moves that this Honorable Court permit the plaintiff to

serve the complaint, summons, summons to trustee, and all other

necessary documents upon the defendants, the trustee and all

other necessary parties by special process server/disinterested

party over the age of 18 in accordance with Mass. R. Civ. P.

4(c) and in accordance with the special permission from this

Court granted herein. To Wit: David Ayles/QuickServ, Quincy, MA.

WHEREFORE, the plaintiff moves that this Honorable Court permit the plaintiff to serve the complaint, summons, summons to trustee and all other necessary documents upon the defendants, the trustee and all other necessary parties by special process server/disinterested party over the age of 18 in accordance with Mass. R. Civ. P. 4(c) and in accordance with the special permission from this Court granted herein.

ULTIMATE CLASSIC CONSTRUCTION INC.
By its attorney,

Alan M. Cohen BBO # 088375
Glenn Wegrzyn BBO # 676398
LAW OFFICES OF ALAN M. COHEN LLC
550 Worcester Road
Framingham, MA 01702
(508) 620-6900
acohen@collections-law.com

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                    SUPERIOR COURT
                                                CIVIL ACTION NO.

ULTIMATE CLASSIC CONSTRUCTION INC.,
     Plaintiff

v.

BLACKBOARD SPECIALTY INSURANCE COMPANY
F/K/A HAMILTON SPECIALTY INSURANCE COMPANY,
YORK RISK SERVICES GROUP, INC., AND SEDGWICK,
INC.

### NOTICE OF APPEARANCE

Now comes Alan M. Cohen, Esquire of the Law Offices of Alan

M. Cohen LLC and hereby enters a notice of appearance on behalf

of ULTIMATE CLASSIC CONSTRUCTION INC.

                         ULTIMATE CLASSIC CONSTRUCTION INC.
                         By its attorney,

                         Alan M. Cohen BBO # 088375
                         Glenn Wegrzyn BBO # 676398
                         LAW OFFICES OF ALAN M. COHEN LLC
                         550 Worcester Road
                         Framingham, MA 01702
                         (508) 620-6900
                         acohen@collections-law.com



MARA VELASCO
2149323601
CT - DALLAS SOP TEAM
1999 BRYAN STREET
DALLAS TX 75201

**1.0 LBS    LTR    1 OF 1**

SHIP TO:
KEITH J. WAGNER
6469270704
BLACKBOARD INSURANCE
120 BROADWAY, 17TH FLOOR
**NEW YORK  NY 10271**

Envelope: UPS_SMALL_BOX
Total Pages: 184

 **NY 102 9-09**



**UPS NEXT DAY AIR**    **1**
TRACKING #: 1Z X21 278 01 3092 4654



BILLING: P/P

Reference No.1: SOP/2401130/537985448/CT SOP Custo



https://thinclient.shipexec.com/#!/shipping

7/30/2020

FELIX SORRENTINI
1 212-458-2965
AIG
175 WATER STREET
NEW YORK NY 10038

4 LBS

1 OF 1

SHIP TO:
    ASHLEY BRUMM
    AIG SHARED SERVICES
    1ZX212780130924654
    1ZX2127801
    17200 W 119TH ST

## OLATHE  KS 66061-7054



# KS 662 9-25

## UPS NEXT DAY AIR

1

TRACKING #: 1Z 6AW 980 24 9401 1340



BILLING:   P/P
SIGNATURE REQUIRED

Reference No.1: 0040016554
Reference No.2: AIG 01

XOL 20 08.05    NV45 31 04 07/2020



ShipExec™ Thin Client

1/1